2002 WY 88

**Rex Brian DAVIS, Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 00–301.

Supreme Court of Wyoming.

June 12, 2002.

W. Keith Goody, Jackson, Wyoming, Representing Appellant.

Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] In this appeal, Appellant Rex Davis (Davis) requests that we review the trial court's denial of his motion for a new trial brought pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a jury trial and convictions for conspiracy to deliver methamphetamine and delivery of methamphetamine, Davis learned that the State failed to disclose impeachment material concerning its primary witness and

brought his motion. The trial court conducted a hearing and denied the motion.

[¶ 2] We reverse and remand for new trial.

## ISSUES

[¶ 3] Davis presents this statement of the issue for our review:

Did the failure of the State to disclose the existence of the Morris Powell wire and tape violate the defendant's constitutional right to due process of the law, to be confronted with the witnesses against him and the effective assistance of counsel under the 5th, 6th, and 14th Amendments to the United States Constitution and the applicable Wyoming constitutional provisions?

The State declares the issue is:

Was Appellant denied a fair trial by the State's failure to disclose potential impeachment evidence?

## FACTS

[¶ 4] In 1998, the Wyoming Division of Criminal Investigation (DCI) recorded Bobbie Morris selling methamphetamine to a DCI informant on three separate occasions. Subsequently, Morris agreed to be a DCI confidential informant. On June 3, 1999, Morris notified DCI that she had arranged to purchase methamphetamine from Richard Wilkie later that evening. DCI determined that Morris should buy an "eight ball" of methamphetamine and provided her with money for that purpose. Morris carried a microcassette recorder and wore a body transmitter, and DCI agents set up surveillance near Wilkie's home and monitored transmission.

[¶ 5] Morris arrived at and entered a home next to Wilkie's where he was visiting with neighbors. Wilkie did not have methamphetamine to sell to her but twice called someone else and left messages on an answering machine. The recording of Morris' activities while waiting to purchase drugs covered a considerable time and included periods when a stereo's volume was turned up loudly blocking out talking and other sounds and when Morris spent about thirty minutes at the home of Wilkie's neighbor. Morris testified that Wilkie smoked marijuana while she was there. Morris and Wilkie returned to Wilkie's house and, after a third call, Wilkie talked to "Debbie" and told Morris that "Debbie" was on her way. Soon afterwards, Davis and his friend, Deborah Hensley, arrived at Wilkie's residence in Davis' pickup truck.

[¶ 6] The microcassette recorder carried by Morris did not record the drug transaction and, at trial, Morris testified that she had not known that it was not working and had not shut it off. The body transmitter worn by Morris, however, continued to work and revealed Hensley asking Morris what she needed, to which Morris replied, "a ball." Hensley replied that, "we only have a gram." Morris asked the price, and Hensley can be heard stating, "eighty," and Morris stating that she would take the gram. Wilkie, Morris, and Hensley went into Wilkie's home, and the purchase was made.

[¶ 7] Davis was charged with one count of delivery of methamphetamine and one count of conspiracy to deliver methamphetamine. At trial, Morris testified that Davis had participated in the above conversation by telling Hensley that they had a gram and that the price was eighty, and Hensley then relayed that information to Morris. Morris also testified that Davis pulled out a baggie from his pocket and handed it to Hensley who then left the vehicle, entered Wilkie's home, and finished the transaction. The critical issue in Davis' trial was whether Davis could be heard participating in the delivery. The prosecution argued to the jury that it could hear a male voice in the background making these statements. A DCI agent observing the buy testified that he saw Davis in the truck but could not hear the statements; however another DCI agent testified that he could hear Davis make these statements. The only witness to testify to these events was Morris because Hensley was also prosecuted for conspiracy to deliver and delivery in a separate trial and did not testify, and Wilkie was deceased.

[¶ 8] Although the prosecution contended that the Morris tape confirmed Morris' ver-

sion of the events during the buy, the State took steps to establish her credibility and had the DCI agent responsible for Morris as an informant testify that he found her particularly trustworthy.[1] This DCI agent testified in pertinent part:

Q. Who was the confidential informant in this case?

A. Bobbie Morris.

Q. Had you previously worked with Ms. Morris?

A. Yes sir.

Q. Approximately how many times had you worked with Ms. Morris?

A. I would—I would say in the neighborhood of eight to ten times, somewhere along in there.

Q. Is it common for you to work with a confidential informant eight to ten times?

A. Yes, sir, especially one you trust.

Q. Was that, indeed, the case with Ms. Morris?

A. Yes, sir.

Q. Why did you feel that way about Ms. Morris?

A. Well, we had—we had given Ms. Morris random UAs [urinalysis]. They always came clean. And one way, if you want to build your credibility, is when a confidential informant provides you with information and you can in turn go back out and corroborate that information and know that that information is true, you know, that that just boosted that credibility so much, and Ms. Morris did that on numerous occasions.

[¶ 9] Additionally, Morris testified that she had agreed to become an informant to avoid prosecution because of concerns that she might lose custody of her children, and also to change her life by recovering from her drug addiction and trying to escape the drug world.

[¶ 10] Davis' defense council contended that the jury could not hear Davis' statements on the Morris tape and Morris' testi-

mony was not credible because she was a paid informant who had manipulated the events of the drug transaction that evening. Defense counsel explored whether Morris could have purchased the drugs from the neighbors or Wilkie, and suggested that the stereo volume was turned up loudly to deliberately disguise her own drug use that evening. Morris testified that she had not yet been prosecuted for her three earlier arrests, and had used drugs once two months earlier since she began working for DCI. Davis was convicted on both counts and sentenced to concurrent terms of eight to twelve years.

[¶ 11] Three days after Davis' sentencing, an informant, Charlotte Powell, notified Davis' defense counsel that approximately thirty days before Davis' trial, she had tape-recorded a conversation with Morris for a murder investigation conducted by the Rock Springs Police Department. Morris was not a suspect but was believed to have information about the murder.[2] Powell informed Davis' defense counsel that the tape had recorded Morris using narcotics. Defense counsel moved for new trial on the basis of a *Brady* violation, and the district court held a hearing.

[¶ 12] At the hearing, Davis' defense counsel contended that on the Powell tape, Morris could be heard consuming the methamphetamine and, in contrast to her trial testimony and the prosecution's contentions at trial, making statements that indicated she was not a reformed addict who had escaped the drug world. Powell testified that before Davis' trial, DCI personnel had learned Powell had recorded her conversation with Morris and were angry with her for doing so. Powell testified that, at the time of the recording, she arrived at Morris' apartment and saw methamphetamine and drug paraphernalia; some time after Powell first spoke with Morris about the murder investigation, Morris and another person present consumed the methamphetamine and continued talking; and audible tapping sounds on the Powell tape were attributed to a razor's cut-

---

1. The propriety of the court's admission of the tape and both agents' testimony are at issue in the appeal only as it relates to materiality of the *Brady* violation.

2. This murder was unrelated to Wilkie's death. Police believed that the person who had committed a murder at a convenience store may have confided in Morris.

ting the drug into lines. Powell also testified that after Davis' trial, Morris told Powell that Davis had not been involved in the drug transaction as she had testified, but felt compelled to testify against Davis because she believed her cooperation would help her keep custody of her children. Powell claimed that Morris told her that Morris' tape recorder had not malfunctioned during the drug transaction as she had testified at Davis' trial, but that she had deliberately turned it off.

[¶ 13] Morris testified at the hearing and admitted the drug use on that occasion when Powell interviewed her for the murder investigation, but testified that she had admitted drug use at Davis' trial and the Powell interview was the incident that she admitted. The trial court determined that no *Brady* violation had occurred and denied Davis' motion. This appeal followed.

## DISCUSSION

■■■■ [¶ 14] In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court set forth the basic principle that the prosecution violates due process by suppressing favorable evidence that is material either to the guilt or to the punishment of the accused, "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. Later the Court extended the *Brady* rule by holding that the prosecution violates due process by suppressing information concerning the reliability of a key witness when such impeachment evidence would be material to guilt or innocence, finding that when the reliability of a given witness may well be determinative of guilt or innocence, important evidence affecting credibility may be *Brady* material. *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The duty to disclose impeachment and exculpatory evidence applies even though there has been no request by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *United States v. Bagley,* 473 U.S. 667, 680–81, 105 S.Ct. 3375, 3382–83, 87 L.Ed.2d 481 (1985); *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). "Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.' In order to comply with *Brady,* therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " *Strickler,* 527 U.S. at 280–81, 119 S.Ct. at 1948 (citing *Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490 (1995).

[¶ 15] *Strickler* articulated the underlying philosophy of these decisions in this way:

These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust.

*Strickler,* 527 U.S. at 281, 119 S.Ct. at 1948.

■■■■ [¶ 16] We must determine, therefore, whether the government's failure to disclose evidence favorable to the defendant deprived the defendant of a fair trial under *Brady* by considering whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 290, 119 S.Ct. at 1952 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. at 1566). In order to establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. *Helm v. State,* 1 P.3d 635, 639 (Wyo.2000). We have previously decided that the materiality of withheld evidence and its possible effect on the outcome of the trial are mixed

questions of fact and law. *Id.* Generally, the denial of a motion for a new trial is reviewed for an abuse of discretion; however, a claim of failure to disclose evidence in violation of *Brady* is properly reviewed de novo. *United States v. Hughes,* 33 F.3d 1248, 1251 (10th Cir.1994).

*Analysis of Elements*

[¶ 17] The first element requires that we determine whether Davis showed that the prosecution suppressed evidence. Davis presented testimony showing that DCI knew about the Powell tape before trial. When the prosecution learned about it after trial, it did disclose. A prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. *Kyles,* 514 U.S. at 437–38, 115 S.Ct. at 1567. In this case, the Powell tape is admissible[3] to impeach Morris' testimony at Davis' trial that she had used drugs two months before trial when she had actually used drugs more recently and to impeach the DCI agents' testimony vouching for Morris' credibility. The discovery of the Powell tape directly led to the defense's discovery of Powell's post-trial conversation with Morris where Powell alleges that Morris said she had intentionally shut off the tape recorder, and stated different motives for testifying against Davis. Powell's version of Morris' post-trial statements contradicts Morris' trial testimony and could potentially be recognized as improperly suppressed *Brady* evidence. *See Paradis v. Arave,* 240 F.3d 1169, 1178–79 (9th Cir.2001). These post-trial contradictions obviously could not have been disclosed before trial, however, and, because they were not in existence before trial, cannot be part of an analysis as to whether the suppression of the Powell tape was a *Brady* violation. *Strickler,* 527 U.S. at 283, 119 S.Ct. at 1949. Nevertheless, by showing that the State failed to disclose the Powell tape which did exist before trial, Davis has met his burden on this element.

[¶ 18] The next element, that Davis prove the evidence would have been favorable to him, is also established by the record. Favorable evidence includes impeachment evidence, and the undisclosed Powell tape of Morris' use of drugs is impeachment evidence, particularly so when her use was at a time different than that to which she had testified. The Powell tape is also impeachment evidence because, at trial, the defense had no evidence and could only suggest that Morris' motives were not as pure as she testified. Further, the defense at trial had no evidence with which to challenge the prosecution's bolstering[4] of Morris' credibility with the testimony of DCI agents who vouched for Morris' credibility in that she was trustworthy for various reasons including clean urinalyses results and who stated that one agent could hear Davis make inculpatory statements on an inaudible tape.[5]

---

3. Prior inconsistent statements by a witness are admissible under W.R.E. 613(b):

 "(b) Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

 *Monn v. State,* 811 P.2d 1004, 1006 (Wyo.1991).

4. "The jury is charged with resolving the factual issues, judging the witnesses' credibility, and ultimately determining whether the accused is guilty or innocent. *Gayler v. State,* 957 P.2d 855, 860 (Wyo.1998); *Zabel v. State,* 765 P.2d 357, 362 (Wyo.1988). A witness may not, therefore, vouch for the credibility of another witness or a victim. *Gayler,* 957 P.2d at 860; *Curl v. State,* 898 P.2d 369, 373–74 (Wyo. 1995)."

*Newport v. State,* 983 P.2d 1213, 1215 (Wyo. 1999). Whether Davis can be heard on the tape making the precise statements that Morris alleged he made is a question of fact for the jury to determine.

5. In its presentation of its case, the prosecution established Morris as an informant whom the jury could find trustworthy in several ways. First, Morris testified that her motives for acting as a DCI informant were to cooperate for favorable treatment regarding her own arrests for drug violations; to avoid the possibility of losing custody of her children; and to escape her life as a drug addict in the drug world although she forthrightly disclosed that since becoming a DCI informant, she had used drugs once two months before trial. Second, a DCI agent testified and vouched for Morris' credibility. Finally, another DCI agent testified to a question reserved for the jury, that he could hear the male voice making the statements that Morris testified had been made on the tape.

In the hands of defense counsel, the Powell tape's disclosure indicating that DCI knew that Davis was engaging in illegal activities would have been most useful for challenging all of this testimony.

 [¶ 19] The final element requires that we focus on the materiality of the undisclosed evidence, mindful that favorable evidence is material if "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. In *Kyles*, the Court further reviewed the meaning of materiality as it relates to the final result of the trial:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is **not** whether the defendant would **more likely than not** have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381) (emphasis added).

[¶ 20] In *Strickler*, the Court distinguished between finding a "reasonable probability" that the outcome might have been different requiring a reversal and finding a "reasonable possibility" requiring that the conviction be affirmed. 527 U.S. at 291, 119 S.Ct. at 1953. The dissent in *Strickler* cautioned that the continued use of the term "probability" promoted the likelihood that courts would apply the forbidden "more likely than not" determination and thus violate *Kyles*, and it proposed that the term be deemed "inevitably imprecise," thus warranting changing the term to a "significant possibility." *Id.* at 298, 119 S.Ct. at 1956 (Souter and Kennedy, JJ., concurring and dissenting). The differing conclusions on materiality reached by *Strickler's* majority and dissent in analyzing the particular facts illustrate not only that the preceding discussion is not idle intellectualizing but also that a conclusion regarding materiality may well be entirely subjective when credibility judgments are at issue.

[¶ 21] The subjectivity presented when evaluating the significance of credibility determinations is particularly troublesome in this case where Morris' credibility was the critical issue. Perhaps we could simply dispose of this case by simplistically concluding that had the Powell tape been disclosed, Morris would not have testified that she had used drugs two months earlier, but would have testified that she used them one month earlier; or by agreeing with the trial court that Morris had admitted that she had used drugs on a single occasion and a new trial is not required; or by deciding that the difference in time frames relating to Morris' drug use does not undermine our confidence in the verdict.

 [¶ 22] However, our review indicates that the portions of the Morris tape where Davis allegedly made his inculpatory statements are inaudible, and, therefore, Davis' trial was dependent entirely upon Morris' testimony. Impeachment evidence that could be used to discredit such an important witness or cast doubt on her veracity is usually material. As previously discussed, the prosecution presented DCI agent testimony that bolstered Morris' credibility and opined that Davis could actually be heard on the tape. The Powell tape could have been used to discredit that testimony also. "The question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453, 115 S.Ct. at 1575. Because no evidence other than Morris' testimony established Davis' alleged inculpatory statements, we hold that the undisclosed evidence is material, Davis' conviction is reversed, and this case is remanded for new trial.