2008 WY 83

**Christopher Robert HICKS,
Appellant (Defendant),**

**v.**

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. S–07–0086.**

Supreme Court of Wyoming.

July 16, 2008.

Representing Appellant: Sylvia Lee Hackl of Cheyenne, Wyoming; * Michael H. Reese of Michael Henry Reese, P.C., Cheyenne, Wyoming.** Argument by Ms. Hackl.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Christopher Hicks was tried on charges relating to two homicides that occurred in Gillette, Wyoming, in the fall of 2005. He was convicted on one count of first degree murder, and on two counts of conspiracy to commit murder. He was acquitted on another count of first degree murder. He was sentenced to three consecutive terms of life imprisonment without the possibility of parole. On appeal, Mr. Hicks contends that the district court erred in denying his motion to suppress evidence of statements he made to law enforcement officials after his arrest, and that the district court erred in denying his motion for a new trial on the grounds

that the prosecution improperly withheld exculpatory evidence. After careful consideration, we affirm the district court's rulings.

## ISSUES

[¶2] Mr. Hicks presents the following two issues:

I. Whether the district court erred in denying Appellant's motions to suppress his post-arrest statements made to law enforcement.

II. Whether Appellant is entitled to a new trial because the State suppressed exculpatory evidence in violation of his right to due process.

## FACTS

[¶3] During the summer and fall of 2005, several men shared a trailer home in Gillette. One of them, Kent Proffit, Sr., was approximately forty years of age. Also living there were his son, Kent Proffit, Jr., Christopher Hicks, Jacob Martinez, and Jeremy Forquer, all of whom were eighteen or nineteen years old. One frequent visitor to the home was fifteen year old Michael Seiser.[1] The facts related here are based largely on the trial testimony of Mr. Martinez and Mr. Seiser.

[¶4] Near the end of September, Mr. Hicks told Mr. Martinez about a plan to bring a large amount of marijuana to Gillette, and asked Mr. Martinez to help sell it. When that plan "went bad," Mr. Hicks told Mr. Martinez that the two of them were being blamed, and that their lives had been threatened, by persons not identified in the record. When Mr. Hicks related these difficulties, Mr. Proffit, Sr., said that he was "connected" and could take care of their problems. After making some telephone calls, he led Mr. Hicks and Mr. Martinez to believe that he had resolved their problems, and he informed Mr. Hicks and Mr. Martinez that they "owed him favors."

[¶5] During this time, Mr. Proffit, Sr., was awaiting trial on charges that he had sexually assaulted his sixteen year old stepson, BC.[2] Mr. Proffit, Sr., often complained about BC and called him insulting names. At least two people overheard him saying that BC should be killed. As one witness testified, Mr. Proffit, Sr., said that BC "would be dead before he went to jail again." Mr. Proffit, Sr., let Mr. Hicks and Mr. Martinez know that one of the favors he expected of them was the killing of BC.

[¶6] In the meantime, Mr. Proffit, Sr., also told Mr. Hicks and Mr. Martinez that Mr. Forquer was "working for the cops." He said that Mr. Forquer could tell law enforcement officials of their discussions about killing BC, and that if they did not get "rid of" Mr. Forquer, he might also inform the authorities about their involvement with illegal drugs. Mr. Proffit, Sr., helped them formulate a plan for killing Mr. Forquer. The plan was that Mr. Proffit, Sr., would ask Mr. Hicks how to perform a certain "chokehold." Mr. Hicks would agree to show him, and they would get Mr. Forquer to volunteer for the demonstration. Rather than simply demonstrating the chokehold, however, Mr. Hicks would continue strangling Mr. Forquer until he was dead.

[¶7] They implemented the plan late one evening in the kitchen of the trailer home. Mr. Proffit, Sr., Mr. Hicks, Mr. Martinez, Mr. Seiser, and Mr. Forquer were all present. As requested by Mr. Proffit, Sr., Mr. Hicks demonstrated the chokehold on Mr. Forquer, then maintained it until Mr. Forquer lost consciousness. Mr. Hicks then indicated that he was getting tired, however, and based on concerns that Mr. Forquer might still be alive, Mr. Proffit, Sr., directed Mr. Martinez to get a rope, which was tightened around Mr. Forquer's neck and left there until they were certain he was dead.

[¶8] Again as directed by Mr. Proffit, Sr., they used diluted bleach to clean the

---

1. Because Mr. Seiser was a minor, we would generally refer to him only by his initials. However, by the time of Mr. Hicks's trial, Mr. Seiser had been charged, as an adult, in connection with his involvement in the two homicides. He had agreed to plead guilty to second degree murder, conspiracy to commit second degree murder, and accessory after the fact. Given these circumstances, we will refer to Mr. Seiser by his name.

2. We will conform to our usual practice, and refer to this minor by his initials.

body of Mr. Forquer, and around the kitchen where he had been killed. They lined the trunk of Mr. Hicks's car with plastic bags, and put the body of Mr. Forquer inside. They also put Mr. Forquer's personal belongings into the car. They drove west on the interstate highway, throwing out Mr. Forquer's belongings at various places along the highway. They concealed Mr. Forquer's body under a tree about fifty yards away from the road.

[¶ 9] With Mr. Forquer gone, Mr. Proffit, Sr., again started talking about killing BC. Mr. Proffit, Sr., said he would have Mr. Hicks, Mr. Martinez, and Mr. Seiser all killed if they did not kill BC. Mr. Proffit, Sr., helped them develop a plan for shooting BC, which included efforts to modify the bullet so the gunshot would make less noise. At Thanksgiving time, Mr. Proffit, Sr., left to spend time in Sheridan, and ordered that BC must be killed while he was gone so that he would have an alibi.

[¶ 10] In the early morning hours on the day after Thanksgiving, Mr. Seiser, Mr. Hicks, and Mr. Martinez drove to BC's home. They drove around the subdivision to make sure no one was around. Mr. Seiser stopped the car and remained inside the vehicle, while Mr. Hicks and Mr. Martinez walked up to the house. Mr. Hicks helped Mr. Martinez open the door, and then Mr. Hicks returned to the car while Mr. Martinez went inside and shot BC. Afterwards, the three men hid the empty bullet casing in the garage of a man they hoped would become a suspect in the murder. They disposed of the gun in a septic tank near Mr. Seiser's home. The three then returned to where Mr. Hicks and Mr. Martinez lived, smoked marijuana, and went to bed. BC's mother later discovered his body.

[¶ 11] At trial, Mr. Hicks was acquitted on the charge of first degree murder of Mr. Forquer. He was convicted of conspiracy to commit first degree murder for the killing of Mr. Forquer, and of both first degree murder and conspiracy for the killing of BC. Additional facts relating to analysis of the issues raised by Mr. Hicks are set forth in the discussion below.

## DISCUSSION

### I. Motions to Suppress

[¶ 12] Prior to trial, Mr. Hicks filed motions to suppress statements he had made to law enforcement officials on the two days following his arrest. He asserted that the statements were made involuntarily, and after he had invoked his rights to remain silent and to consult with counsel. The district court held a hearing on the motions to suppress. The district court denied the motions, finding that Mr. Hicks's statements were made after a knowing, intelligent, and voluntary waiver of his rights. The statements challenged by Mr. Hicks were admitted into evidence at the trial. On appeal, Mr. Hicks challenges the district court's denial of his motions to suppress.

#### A. Standard of Review

[¶ 13] When we review a district court's decision to deny motions to suppress, we defer to the district court's findings of fact unless they are clearly erroneous. The evidence is viewed in a light favorable to the district court's determination, because that court had the opportunity to hear the evidence and assess the credibility of the witnesses. *Monroe v. State,* 2006 WY 5, ¶ 10, 126 P.3d 97, 99 (Wyo.2006); *Hadden v. State,* 2002 WY 41, ¶ 17, 42 P.3d 495, 499 (Wyo. 2002). Voluntariness "is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo." *Pena v. State,* 2004 WY 115, ¶ 7, 98 P.3d 857, 862 (Wyo.2004) (quoting *Mitchell v. State,* 982 P.2d 717, 721 (Wyo.1999)).

#### B. Background

[¶ 14] For the factual background of this issue, we turn to the record of the district court's hearing on the motions to suppress, and in particular to the testimony of the lead investigator. On December 19, 2005, the investigation of the murder of BC led to the arrest of both Mr. Hicks and Mr. Martinez. The two were arrested at the same time and the same place, so each knew that the other had been arrested. The investigator informed Mr. Hicks that he was charged with the murder of BC, and advised Mr. Hicks of

his rights to remain silent and to be represented by an attorney. These are the rights commonly referred to as *Miranda* rights, based on the United States Supreme Court decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Hicks invoked his right to remain silent, and was booked into jail without being interrogated.

[¶ 15] The following morning, however, the investigator was told by staff from the jail that Mr. Hicks wanted to talk with him. The investigator met with Mr. Hicks at about 8:45 a.m., and again advised him of his *Miranda* rights. Mr. Hicks indicated that he was willing to talk because he wanted to "work a deal." He told the investigator that he was not involved in the murder of BC, but he knew who was, naming Mr. Proffit, Sr., and Mr. Martinez. The interview lasted approximately thirty minutes, and at its conclusion, the investigator said he would talk to the prosecuting attorney's office and "find out what information would be relevant and see what could be done."

[¶ 16] While the investigator was still meeting with the prosecuting attorney, he learned that Mr. Hicks had asked to talk with him again. Before the investigator could get back to the jail, Mr. Hicks told another law enforcement officer that he knew the location of the gun used to shoot BC, and wanted to tell the investigator where it was. The record indicates that the conversation with the other officer took place at approximately 10:10 a.m. It does not indicate whether Mr. Hicks was again advised of his *Miranda* rights during his brief conversation with the other officer.

[¶ 17] The lead investigator met with Mr. Hicks again at approximately 11:30 a.m. Once again, the investigator reminded Mr. Hicks of his *Miranda* rights, and once again Mr. Hicks confirmed that he wanted to talk. This time, Mr. Hicks said that he, Mr. Martinez, and Mr. Seiser had disposed of the gun used to shoot BC in a septic tank near Mr. Seiser's home. They had done so at the direction of Mr. Proffit, Sr., who told them that "if they dropped it into a sewer drain, the firearm would never [be] found." Law

enforcement officials soon found the gun at the location Mr. Hicks had indicated.

[¶ 18] While law enforcement officials were recovering the gun, the investigator was told that Mr. Hicks once again wanted to talk with him. At approximately 1:00 p.m., the investigator met with Mr. Hicks, and again advised him of his *Miranda* rights. Mr. Hicks again indicated that he wanted to talk. This time he said that he and Mr. Martinez had driven to BC's home on the night he was shot. Mr. Hicks said that he stayed in the vehicle while Mr. Martinez went into the home and shot BC.

[¶ 19] The next day, Mr. Hicks made his initial appearance before the circuit court judge, and told the court that he would be hiring a private attorney to conduct his defense. Approximately an hour after this initial appearance, however, Mr. Hicks once again asked to talk to the lead investigator. The investigator met with Mr. Hicks again, with no defense counsel present. The investigator reminded Mr. Hicks that he had said he was hiring counsel, and told him, "you are hiring an attorney, talk to your attorney, if you've got anything else your attorney can talk to me." Mr. Hicks said that he still wanted to talk to the investigator. Even so, the investigator again reminded Mr. Hicks of his *Miranda* rights. This time, Mr. Hicks recanted his previous statements about the night BC was shot, saying that he had loaned his car to Mr. Martinez that night, but that he had not accompanied him to BC's home. This was apparently the investigator's last interview with Mr. Hicks.

### C. Analysis

[¶ 20] Under Article 1, §§ 6 and 11 of the Wyoming Constitution, as under the Fifth and Fourteenth Amendments to the United States Constitution, "A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial." *Goulart v. State*, 2003 WY 108, ¶ 6, 76 P.3d 1230, 1233 (Wyo.2003); *see also State v. Evans*, 944 P.2d 1120, 1124 (Wyo.1997). "[T]he State has the burden of proving by a preponderance of the evidence, under the totality of the circumstances, that a confes-

sion, admission, or statement was given voluntarily." *Id.* at 1125.

[¶ 21] Mr. Hicks accurately points out that he did not sign any written acknowledgements or waivers of his *Miranda* rights. None of his statements to the investigator were recorded, although video and audio recording equipment was available at the time. After preparing written reports, the investigator destroyed any notes he had made during the meetings with Mr. Hicks. Thus, the State presented no documentary evidence that Mr. Hicks's statements were voluntary. Mr. Hicks asserts that the investigator's testimony, without documentary support, was insufficient to sustain the State's burden of proving by a preponderance of the evidence that the statements were voluntary.

[¶ 22] It may well be that a written waiver of *Miranda* rights "constitutes 'better' evidence" than oral testimony alone. *Goulart,* ¶ 8 n. 3, 76 P.3d at 1233 n. 3. However, Mr. Hicks has cited no cases, and we have found none, holding that the State is required to present written evidence to prove that a defendant's statements to law enforcement officials were voluntary. We have indicated, to the contrary, that the State may satisfy its burden with "recording *or witness* evidence," (emphasis added) and there is "no requirement that interviews and interrogations must be electronically recorded." *Evans,* 944 P.2d at 1128. In Mr. Hicks's case, the investigator provided clear and unequivocal testimony, which was thoroughly tested through cross examination. This testimony, if believed by the district court, was sufficient evidence for the State to meet its burden of proving that Mr. Hicks's statements were voluntary.

[¶ 23] The district court did believe the testimony, and found that Mr. Hicks had been advised of his *Miranda* rights at least three of the four times he talked to law enforcement officials on the first day after his arrest. The record of the investigator's testimony supports this finding, and we cannot conclude that it is clearly erroneous. The district court correctly concluded, in addition, that "satisfying *Miranda* does not resolve the question of voluntariness," *Evans,* 944 P.2d at 1125, because the State must

further prove that the statements were voluntary, that is, that they resulted from "free and deliberate choice rather than intimidation, coercion, or deception." *Pena,* ¶ 7, 98 P.3d at 862. On this question, the district court found that Mr. Hicks had initiated each of the conversations, and that there was a complete absence of "evidence of threats or promises from any source surrounding the interrogation." Again, these factual findings are supported by the record and are not clearly erroneous. Based on these facts, we agree with the district court's legal conclusion that the statements were "in all respects voluntary."

[¶ 24] Mr. Hicks's statements to the investigator on the second day after his arrest are subject to additional analysis, because they were made after he invoked his right to counsel. We have recognized that when a defendant asserts his right to counsel, "any subsequent waiver of the right to counsel during police-initiated interrogation is invalid." *Houghton v. State,* 6 P.3d 643, 648 (Wyo.2000). This rule does not apply, however, when "the accused himself initiates further communication." *Id.* The burden is on the State to prove that the defendant initiated the contact, and that the waiver of his right to counsel was knowing and voluntary. *Id.; Wells v. State,* 846 P.2d 589, 593–94 (Wyo.1992).

[¶ 25] The investigator's testimony is clear that Mr. Hicks asked to see him soon after the initial appearance in the circuit court. The investigator again advised Mr. Hicks of his *Miranda* rights. The investigator reminded Mr. Hicks that he had asked for an attorney, and actually discouraged Mr. Hicks from talking to him again. Nevertheless, Mr. Hicks said that he still wanted to talk to the investigator. This evidence fully supports the district court's findings that these communications were initiated by Mr. Hicks, and while he had previously invoked his right to counsel, he knowingly and voluntarily waived that right. The district court's findings of fact are not clearly erroneous, and its conclusions of law are correct. We affirm its denial of Mr. Hicks's motions to suppress evidence of his statements to the investigator.

## II. Suppression of Exculpatory Evidence

[¶ 26] Mr. Hicks contends that the prosecution improperly suppressed evidence that would have been favorable to his defense. After trial, but before sentencing, Mr. Hicks moved the district court for a new trial on that basis. The district court denied the motion. On appeal, Mr. Hicks challenges the district court's decision.

### A. Background

[¶ 27] On the first day of trial, Mr. Martinez testified that, approximately two weeks before Mr. Forquer was killed, there was a discussion among Mr. Proffit, Sr., Mr. Proffit, Jr., Mr. Hicks, and Mr. Martinez about digging a grave for Mr. Forquer's body. Mr. Martinez testified that he, Mr. Hicks, and Mr. Proffit, Jr., had dug the grave somewhere west of Gillette. At the direction of Mr. Proffit, Sr., however, Mr. Forquer's body was not left in the grave they had dug.

[¶ 28] Mr. Proffit, Jr., was not a witness in Mr. Hicks's trial. The prosecution had issued him a subpoena, however, and on the fourth day of the trial, they interviewed him for the purpose of determining whether to call him as a witness. During that interview, Mr. Proffit, Jr., confirmed that he, Mr. Martinez, and Mr. Hicks had dug a hole somewhere west of Gillette. However, he said that it was not intended as a grave for Mr. Forquer, but as a hunting blind. The hole, according to Mr. Proffit, Jr., was not big enough to be used as a grave. The prosecution did not call Mr. Proffit, Jr., as a witness, and it did not disclose his statements to Mr. Hicks's defense counsel.

[¶ 29] After Mr. Hicks was convicted, but before he was sentenced, his defense counsel learned about Mr. Proffit's statements. Mr. Hicks moved for a new trial, asserting that this information had been improperly suppressed, and that pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was entitled to a new trial. After a hearing in which Mr. Proffit, Jr., was a witness, the district court denied the motion for a new trial.

### B. Standard of Review

[¶ 30] We generally review a district court's denial of a motion for a new trial for abuse of discretion. *Chauncey v. State*, 2006 WY 18, ¶ 13, 127 P.3d 18, 21 (Wyo.2006). However, an improper suppression of exculpatory evidence violates a defendant's constitutional rights, and constitutional issues are usually subject to *de novo* review. *Wilkening v. State*, 2007 WY 187, ¶ 6, 172 P.3d 385, 386 (Wyo.2007). Accordingly, we will review *de novo* the district court's decision to deny Mr. Hicks's motion for a new trial on the grounds that the State improperly suppressed exculpatory evidence.

### C. Analysis

[¶ 31] It is a violation of due process for the prosecution to suppress evidence that is favorable to a defendant, and material to the defendant's guilt or punishment. *Wilkening*, ¶ 7, 172 P.3d at 386–87; *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. Accordingly, to establish a *Brady* violation, Mr. Hicks has the burden of demonstrating that the evidence was favorable, that it was suppressed, and that it was material. *Wilkening*, ¶ 7, 172 P.3d at 387.

[¶ 32] The district court ruled that the evidence was favorable to Mr. Hicks, because it could have been used to impeach Mr. Martinez, one of the main witnesses against Mr. Hicks. The State does not contest this ruling. It is well established that impeachment evidence may be favorable evidence for purposes of a *Brady* analysis. *See, e.g., Davis v. State*, 2002 WY 88, ¶ 14, 47 P.3d 981, 985 (Wyo.2002); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). The district court ruled correctly on this question.

[¶ 33] The district court wrote that it was "not entirely convinced" that the evidence had been suppressed. It noted, on the one hand, that "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Chauncey*, ¶ 25, 127 P.3d at 24 (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982)). Mr. Hicks was pres-

ent when the hole was dug, and if it had been meant for a hunting blind, he knew or should have known that fact. Mr. Hicks had "enjoyed unfettered access" to Mr. Proffit, Jr., and his counsel could have asked Mr. Proffit, Jr., about his version of why the hole was dug. On the other hand, the district court noted this statement from *Chauncey,* ¶ 27, 127 P.3d at 25:

> The State has presented us with no authority to suggest that the content of a witness' interview with law enforcement officers is equally available to a defendant when the defendant is acquainted with that witness. Absent such an argument, this interview appears to be suppressed under *Brady.*

To resolve this uncertainty, the district court in effect gave Mr. Hicks the benefit of the doubt, and assumed that the State had suppressed the statements. For purposes of this opinion, we will employ the same assumption.

[¶ 34] The district court concluded, however, that the evidence was not material. The district court provided a thorough and thoughtful explanation for its conclusion, and we quote at length from the written order denying the motion for a new trial:

> [T]he Defendant vigorously assaulted Martinez' credibility on two independent grounds: 1) he plea-bargained his way out of a possible death sentence in return for his testimony and 2) he admitted to having previously perjured himself ... in related proceedings. In this context, Proffit, Jr.'s rebuttal to Martinez' account of the reason for digging the hole/grave is of relatively light account. Furthermore, given the evidence in the record as to Proffit, Jr.'s own alleged involvement in both murders, it is as likely as not the jury would have entirely disregarded his account of the hole/grave digging as self-serving.
>
> Finally, the court weighs in the balance other evidence adduced at trial indicating the Defendant's guilt on the three (3) counts of which he was convicted, including the testimony of Michael Seiser ... who was eyewitness to the Forquer murder and participated in the planning and execution of [BC's] murder. Seiser's account of the

killings mirrored that of Martinez insofar as implicating the Defendant. Also included in the damning evidence against the Defendant were his own statements to law enforcement, his statement of admission to his girlfriend, ... and his writing to a fellow inmate at the Campbell County Detention Center in which he sought to develop an alibi for himself with respect to both murders.

> Reviewing the record as a whole, the court concludes there is not a reasonable probability the result of the proceeding (guilty verdicts on three of four counts; life without parole as punishment on the two capital counts) would have been different had Proffit, Jr.'s statement been disclosed to the Defendant in a timely manner. Nor did its non-disclosure to the Defendant undermine confidence in the outcome of the trial in either the guilt or penalty phases.

[¶ 35] In a *Brady* analysis, evidence is material "only when a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed." *Thomas v. State,* 2006 WY 34, ¶ 15, 131 P.3d 348, 353 (Wyo. 2006). There is a reasonable probability of a different result "when the suppression of evidence undermines confidence in the outcome of the trial." *Id.* The district court's order demonstrates that it applied the correct legal standard in determining whether the evidence was material.

[¶ 36] We also find no fault in the district court's application of that law to the facts of this case. It is true that "evidence that could be used to discredit such an important witness or cast doubt on [his] veracity is usually material." *Davis,* ¶ 22, 47 P.3d at 987. It is not always material, however, and Mr. Hicks presents the unusual case in which it is not. Upon our review of the record, we agree that the credibility of Mr. Martinez was "vigorously assaulted," to borrow the district court's language. There is no reasonable probability that the result of the trial would have been different if Mr. Martinez had been discredited on another point that was, at most, tangentially related to the main evidence. The suppression of

"one additional piece of cumulative information" does not render a "verdict unworthy of confidence." *Chauncey*, ¶ 21, 127 P.3d at 24.

[¶ 37] The record also fully supports the district court's conclusion that similarities in the testimony of Mr. Martinez and Mr. Seiser convincingly implicated Mr. Hicks in both murders. The two witnesses provided nearly identical testimony not only about the main events of the murders, but also, notably, on minor details such as the use of diluted bleach to clean Mr. Forquer's body, and the names of the several persons who had been at the trailer on the evening before BC's murder. The jury may have considered it unlikely that the two witnesses could successfully fabricate such details. Given the extensive and mutually supportive testimony from Mr. Martinez and Mr. Seiser, we agree with the district court that there is no reasonable probability that the outcome of the trial would have been changed if Mr. Hicks had presented evidence about a disagreement between Mr. Martinez and Mr. Proffit, Jr. For these reasons, we agree with the trial court's conclusion that the evidence was not material, and we affirm the trial court's denial of the motion for a new trial.

### CONCLUSION

[¶ 38] We affirm the district court's denial of Mr. Hicks's motion to suppress evidence of his statements to law enforcement officials following his arrest, and of his motion for a new trial on the grounds that exculpatory evidence was improperly suppressed. We therefore affirm in all respects the district court's conviction and sentencing of Mr. Hicks.