2017 WY 147
**Gregory Douglas DAVIS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-16-0253
S-17-0087

Supreme Court of Wyoming.

December 14, 2017

Representing Appellant: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina Ṅ. Olson *, Chief Ap-

*An order granting Ms. Olson's Motion to Withdraw was entered on December 13, 2017.

pellate Counsel; Kirk Morgan, Senior Assistant Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Samuel S. Voyles, Assistant Attorney General. Argument by Mr. Voyles.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

BURKE, Chief Justice.

[¶1] Appellant, Gregory Douglas Davis, challenges his conviction for strangulation of a household member, in violation of Wyo. Stat. Ann. § 6-2-509(a)(i). He contends he was denied a fair trial as a result of prosecutorial misconduct and that there was insufficient evidence to support his conviction. We affirm.

## ISSUES

[¶2] Appellant presents the following issues:

1. Did the prosecutor commit misconduct which denied Appellant his right to a fair trial?
2. Was the verdict supported by sufficient evidence that bodily injury resulted from reckless impeding of breathing or circulation?

## FACTS

[¶3] On June 1, 2015, Appellant asked his estranged wife, Jill Davis, to visit him for dinner before an upcoming operation on his foot. During the visit, Appellant became very emotional and stated that he loved Ms. Davis and couldn't go on without her. He asked for a hug, and she sat on his lap. He started to pull on her clothes and tried to undo her pants, but she told him to stop and asked him to release her. Appellant then became aggressive.

[¶4] Appellant threw Ms. Davis on the floor and tried to take off her clothes. He then let Ms. Davis up from the floor, and she grabbed her phone and car keys and tried to

leave the house. Appellant ran after her, took her phone and keys, and wrestled her to the floor a second time. While on the floor, Appellant laid on top of Ms. Davis, grabbed her neck, and ripped off one of her earrings. She repeatedly told Appellant she could not breathe, and asked him to let go. During the struggle, Appellant tried to give Ms. Davis a hickey on her neck, and she scratched him with her fingernails and bit his arm. After Ms. Davis began to cry, Appellant finally let her up.

[¶5] Ms. Davis retrieved her keys and escaped from the house without stopping to get her shoes. She made a 911 call to the police as she was driving away. During the call, Ms. Davis stated she had been in an altercation with Appellant, and was concerned that he was suicidal. Just after midnight on June 2, 2015, Deputy Trevor Budd of the Campbell County Sheriff's Office was dispatched to Ms. Davis' residence.

[¶6] Ms. Davis told Deputy Budd that Appellant grabbed her neck during the altercation and that she couldn't breathe. Her voice was raspy, her pants were wet in the crotch, and she had red marks on her neck. In a written statement that recounted the events, Ms. Davis stated that "[Appellant] was grabbing my neck. My earring ripped out. I kept telling him I couldn't breathe. Please let go. I can't breathe. Get off me."

[¶7] After she spoke with Deputy Budd, Ms. Davis was evaluated by two emergency medical technicians. She told the EMTs that Appellant had assaulted and choked her, and that she had to fight to get away. She stated that she was unsure whether she lost consciousness during the altercation. The EMTs noted that Ms. Davis had bruising and petechiae [1] around her neck.

[¶8] Later in the day on June 2, 2015, Ms. Davis met with the prosecutor for the first time. The prosecutor explained that Appellant would be charged with strangulation, and Ms. Davis indicated that she had reservations about the term "strangulation." After she was instructed to go to the hospital for an evaluation, however, Ms. Davis reported

---

1. The EMT testified that petechiae are little red dots that appear on the skin as the result of burst capillaries, and are commonly caused by strangulation.

to the admitting nurse that she had been assaulted and strangled. She also reported to the examining nurse that Appellant had choked her and that she had been unable to breathe. She stated that she had urine incontinence and was not sure whether she had lost consciousness. The examining nurse noted that Ms. Davis had a headache and had extensive petechiae around her neck and ears. The nurse concluded that Ms. Davis' symptoms were likely the result of strangulation.

[¶9] Ms. Davis was also evaluated by Dr. Daniela Gerard, an emergency room physician. Dr. Gerard concluded that Ms. Davis' symptoms indicated that it was very likely that she had been strangled. Based upon Ms. Davis' symptoms—including the probable loss of consciousness, her periods of amnesia, the petechiae around her neck, and her incontinence—as well as her statements that Appellant had grabbed her neck, Dr. Gerard diagnosed her with asphyxiation by strangulation.

[¶10] Ms. Davis met with the Sheriff's investigator, Kim Jones, for a taped interview on June 4, 2015. Ms. Davis told Ms. Jones that Appellant had grabbed her neck. Ms. Jones asked Ms. Davis "[i]s that when he strangled you the second time you went down?" Ms. Davis responded with an affirmative "uh-huh." Ms. Davis also stated, however, that she had told the prosecutor that Appellant "did not have his hands around my neck that I remember."

[¶11] Appellant was charged with strangulation of a household member in violation of Wyo. Stat. Ann. § 6-2-509(a)(i) (LexisNexis 2015). Prior to trial, Ms. Davis contacted the State and stated that she wanted an opportunity to reconcile with Appellant and did not agree with the prosecutor's position in plea negotiations. Ms. Davis subsequently submitted an affidavit of non-cooperation that was drafted by Appellant's counsel. In a telephone message on December 7, 2015, she asked the State to drop the charges against Appellant. She met with the prosecutor on January 19, 2016, and minimized the physical altercation and changed the details she had

provided to law enforcement and medical staff.

[¶12] The State subsequently filed a notice of intent to use .Rule 404(b) evidence, stating that it planned to use evidence of other acts by Appellant to explain why Ms. Davis was minimizing the events of June 1, 2015, and changing some of the details from her earlier accounts to law enforcement and medical providers. It also sought to introduce evidence of Appellant's pretrial efforts to influence Ms. Davis' testimony. Appellant objected to the State's motion to introduce evidence under Rule 404(b) and requested a *Daubert* hearing to determine the admissibility of the State's proposed expert testimony relating to the behavior of victims of domestic violence. The State also filed a motion to treat Ms. Davis as a hostile witness because she was no longer cooperating with the State.

[¶13] The court held a hearing on the proposed expert testimony, the proposed Rule 404(b) evidence, and the State's motion to treat Ms. Davis as a hostile witness. The court concluded that the expert testimony would be helpful to the jury and determined that the expert would be allowed to testify. However, it reserved ruling on the State's motion to treat Ms. Davis as a hostile witness until Ms. Davis took the stand at trial.[2] The court took the 404(b) matter under advisement and subsequently issued an order concluding that the State's evidence relating to Appellant's post-arraignment influence over the victim was admissible under Rule 404(b). However, it excluded evidence relating to Appellant's prior assaults against Ms. Davis.

[¶14] At trial, Ms. Davis testified during both direct and cross-examination that the first time she met with the prosecutor she told the prosecutor that she had not been strangled. On cross-examination, in response to questioning about the prosecutor's use of the term "strangulation" during her interview on June 2, Ms. Davis stated "I said that that's wrong, that this was never a strangulation. There was no strangulation." She also

---

**2.** The district court stated that "the Court really can't tell in these contexts whether the witness is going to be hostile until the witness takes the stand and until the Court can hear the responses and watch the demeanor. So I'm going to reserve ruling on this motion until that happens."

testified that she disagreed with the charges from the beginning of the case.

[¶15] After a five-day trial, the jury found Appellant guilty of recklessly causing bodily injury to Ms. Davis. The jury found that Appellant perpetrated the strangulation by impeding Ms. Davis' breathing and by impeding circulation of blood by applying pressure on her throat or neck. The district court imposed a prison sentence of two to four years.

[¶16] On April 20, 2016, Appellant filed a motion for a new trial based upon Ms. Davis' testimony that Appellant had not grabbed her neck. The district court denied the motion. Appellant filed a notice of appeal, and that case was docketed as Case No. S-16-0253. On December 29, 2016, Appellant filed a second motion for a new trial, and this Court stayed the proceedings in Case No. S-16-0253 to allow the district court to address that motion. Appellant's second motion for a new trial asserted that the State failed to disclose during discovery that Ms. Davis had told the prosecutor on June 2 that Appellant had not strangled her.

[¶17] At the hearing on Appellant's motion, the prosecutor stated that, at the June 2 meeting, Ms. Davis indicated that she disagreed with the term strangulation "because she envisioned it as hands on neck versus a chokehold that she demonstrated on the video when speaking with Ms. Jones." Following the hearing, the court denied Appellant's motion. The court's order states:

> During the June 4, 2015 interview with Investigator Kim Jones of the Campbell County Sheriff's Department, Jill Davis stated that she disagreed with the term "strangulation." Further, she stated that she had told the prosecution that she disagreed with the term "strangulation" when she had spoken with them previously. The video recording of the victim interview with Kim Jones was provided to the defense on September 4, 2015. Such was also discussed during the Daubert hearing conducted on February 11, 2016. Additionally, [defense counsel] cross-examined Ms. Davis during the trial regarding her statements to the prosecution on June 2 that she had argued with them about Mr. Davis not having had his hands around her neck.

> The court finds that the State provided the complained-of exculpatory evidence to the defense in compliance with the requirements of Brady v. Maryland.

Appellant appealed the denial of his motion for a new trial, and that case was docketed as Case No. S-17-0087. We consolidated the appeals for purposes of briefing and decision.

## DISCUSSION

### I. Prosecutorial Misconduct

[¶18] In his first issue, Appellant contends the prosecutor committed misconduct by withholding exculpatory information from the defense. He also claims that the prosecutor's failure to disclose exculpatory evidence allowed the prosecutor to misrepresent facts to the court and hold herself out as a witness contradicting Ms. Davis' testimony regarding her statements to law enforcement. Because Appellant alleges a violation of his constitutional rights, our review is de novo:

> We generally review a district court's denial of a motion for a new trial for abuse of discretion. Hicks v. State, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008). However, an improper suppression of exculpatory evidence violates a defendant's constitutional right to due process, and constitutional issues are usually subject to de novo review. Id. Accordingly, we will review de novo the district court's decision to deny [the appellant's] motion for a new trial on the grounds that the State improperly suppressed exculpatory evidence. Id.

Lawson v. State, 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010).

[¶19] The right to a fair trial is guaranteed by the Due Process Clause of the Fourteenth Amendment. Lawson, ¶ 20, 242 P.3d at 1000. As set forth in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the suppression by the prosecution of evidence favorable to a defendant and material to his guilt violates due process. As we noted in Lawson:

> "The right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amend-

ment, imposes on States certain duties consistent with their sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451, 129 S.Ct. 1769, 1772, 173 L.Ed.2d 701 (2009), citing *United States v. Agurs*, 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The suppression by the prosecution of evidence favorable to a defendant and material to his guilt violates due process. *Hicks*, ¶ 31, 187 P.3d at 883, citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). This is true irrespective of whether the prosecution acted in good or bad faith in suppressing the evidence. *Chauncey v. State*, 2006 WY 18, ¶ 12, 127 P.3d 18, 21 (Wyo. 2006), citing *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). The rule exists to "ensure that a miscarriage of justice does not occur." [*Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379 – 80].

In order to establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. *Id*. . . .

Evidence is material under *Brady* only when a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *Thomas v. State*, 2006 WY 34, ¶ 15, 131 P.3d 348, 353 (Wyo. 2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*.

*Lawson*, ¶¶ 20–22, 242 P.3d at 1000.

 [¶20] Appellant contends that the State withheld exculpatory information from the defense in violation of *Brady v. Maryland*. He claims the State did not disclose the fact that, on the morning of June 2, after speaking with law enforcement, Ms. Davis met with the prosecutor and indicated her disagreement with the strangulation charge. The record does not support Appellant's contention.

[¶21] On September 4, 2015, six months prior to trial, the State provided a video recording of the interview with Ms. Davis conducted by Investigator Kim Jones on June 4, 2015. In that video, Ms. Davis made

reference to her previous meeting with the prosecutor, and indicated that she had disputed the prosecutor's characterization of the events as a strangulation:

> I sat and argued with them yesterday. I'm like, "He did not have his hands around my neck that I remember. I do not." They're like, "It doesn't matter, being held down, being pushed, being," I was against the floor and carpet so much that I couldn't, I couldn't even turn my head. I couldn't even.

Moreover, at trial, defense counsel cross-examined Ms. Davis about her meeting with the prosecutor on June 2. Ms. Davis testified as follows:

> [DEFENSE COUNSEL:] What did you tell [the prosecutor]?
>
> [MS. DAVIS:] I said that that's wrong, that this was never a strangulation. There was no strangulation.
>
> . . .
>
> [DEFENSE COUNSEL:] So it sounds like from the get-go you were telling them that you weren't strangled.
>
> [MS. DAVIS:] Correct.

Defense counsel read Ms. Davis the above quote from the June 4 interview, and Ms. Davis clarified that she was referring to her earlier conversation with the prosecutor.

 [¶22] The record clearly indicates that the defense was made aware of the prosecutor's initial conversation with Ms. Davis by disclosure of the video recording of Ms. Davis' June 4 interview. Further, the evidence alleged to have been suppressed was introduced at trial, and Ms. Davis was cross-examined about that evidence. There was no *Brady* violation.

> As long as disclosure is made before it is too late for the defendant to make use of the evidence, due process is satisfied. [*Whitney v. State*, 2004 WY 118, ¶ 58, 99 P.3d 457, 476 (Wyo. 2004).] *Brady* is not violated when the material is available to the defendant during trial. *Id*. The essence of *Brady* is the discovery of information *after the trial*, which was known to the prosecution but unknown to the defense during the trial. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d

342 (1976). Thus, where exculpatory evidence is discovered during the trial and defense counsel has the opportunity to use it in cross-examination, closing argument, or other parts of the defense case, courts generally do not find a due process violation. *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997); *Young v. State*, 849 P.2d 754, 765 (Wyo. 1993). *Thomas v. State*, 2006 WY 34, ¶ 16, 131 P.3d 348, 353 (Wyo. 2006) (emphasis in original); *see also Kovach v. State*, 2013 WY 46, ¶ 21, 299 P.3d 97, 104 (Wyo. 2013).

■■■ [¶23] In addition, Appellant contends that the prosecutor's failure to disclose the June 2 meeting allowed the State to represent, improperly, that Ms. Davis was a recanting witness and had changed her prior story at trial. He also contends that the prosecutor committed misconduct by holding herself out as a witness. As Appellant explains, "When [Ms.] Davis testified that she had told [the prosecutor] directly and personally on June 2, 2015, that there had been no strangulation in the incident, [the prosecutor] did not acknowledge that this was true. She said nothing at all and kept on asserting that [Ms.] Davis had changed her story."

[¶24] For two reasons, we find these additional contentions unpersuasive. First, both are founded on Appellant's basic claim that the prosecution failed to disclose the June 2 meeting with Ms. Davis. We have already concluded, however, that the prosecution adequately disclosed the substance of the June 2 meeting to Appellant.

[¶25] Second, both additional contentions focus on the notion that the prosecution improperly characterized and treated Ms. Davis as a recanting witness who changed her story. But the record demonstrates that Ms. Davis did, in fact, make numerous pretrial statements that were inconsistent with her trial testimony that Appellant did not grab her neck or put his arm around her neck. She told the officer who interviewed her after the incident that Appellant grabbed her neck and she could not breathe. In a report written on June 2, she stated that Appellant grabbed her neck and that she kept telling him she could not breathe. She told the emergency medical technician who responded to the scene that Appellant had choked her.

She reported to the triage nurse who saw her at the hospital after the incident that she had been assaulted and strangled. She told her examining nurse at the hospital that Appellant grabbed her around the neck and that she had been unable to breathe. Based on this record, the prosecutor's portrayal of Ms. Davis as a recanting witness who changed her story was entirely accurate.

## II. Sufficiency of the Evidence

[¶26] In his second issue, Appellant contends there was insufficient evidence to support his conviction. In determining whether the evidence presented at trial was sufficient to sustain a conviction, we apply the following standard of review:

[W]e must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses.

*Counts v. State*, 2012 WY 70, ¶ 52, 277 P.3d 94, 109 (Wyo. 2012) (quoting *Garner v. State*, 2011 WY 156, ¶ 20, 264 P.3d 811, 820 (Wyo. 2011)).

■■■ ■[¶27] Appellant contends there was insufficient evidence to prove that he caused bodily injury to Ms. Davis. He was charged with strangulation in violation of Wyo. Stat. Ann. § 6-2-509(a)(i). The statute provides, in pertinent part, as follows:

§ 6-2-509. Strangulation of a household member; penalty.

(a) A person is guilty of strangulation of a household member if he intentionally and knowingly or recklessly causes or attempts to cause bodily injury to a household member by impeding the normal breathing or circulation of blood by:

(i) Applying pressure on the throat or neck of the household member[.]

The jury found that Appellant recklessly caused bodily injury by impeding normal breathing and circulation of blood by applying pressure on the throat or neck. Appellant contends there was insufficient evidence to support the conclusion that pressure was applied to Ms. Davis' throat or neck and the conclusion that any bodily injury was caused by impeding breathing or circulation.

[¶28] Appellant's argument focuses primarily on the trial testimony of Ms. Davis. He claims that she never testified at trial that Appellant impeded her breathing. According to Appellant, the State's claim that Ms. Davis was not being truthful in her testimony "does not constitute affirmative evidence that she ever reported facts which would constitute the injury, means and mechanism prohibited by W.S. § 6-2-509." Appellant fails to recognize, however, that the State introduced evidence of Ms. Davis' prior statements to medical personnel indicating that Appellant had grabbed her by the neck and that she had been unable to breathe. The State also presented physical evidence of symptoms consistent with strangulation, as well as professional medical opinions that Ms. Davis had been strangled. The evidence, viewed in the light most favorable to the State, is sufficient to prove that Ms. Davis' breathing was impaired from pressure applied to Ms. Davis' neck.

[¶29] Next, Appellant contends there was insufficient evidence to establish any bodily injury. Appellant claims that "The only bodily injury that the evidence suggested may have been caused by impeding the normal breathing or circulation of blood by applying pressure on the throat or neck was the petechiae," and that "Petechiae do not appear to fit within the definition of 'bodily injury.'" We disagree.

[¶30] The statutory definition of bodily injury provides:

§ 6-1-104. Definitions.

(a) As used in this act, unless otherwise defined:

(i) "Bodily injury" means:

(A) A cut, abrasion, burn or temporary disfigurement;

(B) Physical pain; or

(C) Impairment of the function of a bodily member, organ or mental faculty.

With respect to the definition of bodily injury, we have noted that "The statute does not specify particular gradations of physical pain, illness, or impairment." *Mascarenas v. State*, 2003 WY 124, ¶ 15, 76 P.3d 1258, 1265 (Wyo. 2003). We have found that pain from being kicked in the groin and headaches are sufficient to satisfy the definition of bodily injury. *Id.*; *Mueller v. State*, 2001 WY 134, ¶¶ 6, 15, 23, 36 P.3d 1151, 1155, 1157, 1159 (Wyo. 2001).

[¶31] In the present case, the evidence showed that Ms. Davis had extensive petechiae around her neck and ears. She complained of a headache to the emergency room nurse who evaluated her. Further, Dr. Gerard diagnosed Ms. Davis with asphyxiation, or oxygen deprivation. Dr. Gerard testified that the trachea is an airway and, if anything impedes the airway, oxygen cannot get to the lungs or the brain. Additionally, both the emergency room nurse and Dr. Gerard believed that Ms. Davis had probably lost consciousness based on her amnesia. Dr. Gerard testified that Ms. Davis' likely loss of consciousness meant that her brain was not receiving enough oxygen.[3] Viewing the evidence in the light most favorable to the State, we find the evidence is more than sufficient to establish that Ms. Davis experienced bodily injury.

[¶32] Affirmed.

---

3. Referring to Ms. Davis' symptoms, Dr. Gerard commented that "there's a lot of cases where you don't see [any symptoms] and that makes strangulation so difficult to diagnos[e]. So if you do have some of these things, it makes it a lot easier and it's—I don't want to say nice but, you know, it's helpful. But if you don't see it, it doesn't mean that there is [not] an underlying injury that you don't see."