242 P.3d 993 (2010)
2010 WY 145
Aubrey Lashawn LAWSON, Appellant (Defendant),
v.
The STATE of Wyoming, Appellee (Plaintiff).
Nos. S-09-0061, S-09-0209, S-10-0001.
Supreme Court of Wyoming.
November 9, 2010.
*996 Representing Appellant: Diane Lozano, State Public Defender, PDP; Tina Kerin, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.
Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.
Before KITE, C.J., and GOLDEN, HILL, VOIGT[*], and BURKE, JJ.
KITE, Chief Justice.
[¶ 1] A jury found Aubrey Lashawn Lawson guilty of possessing cocaine and methamphetamine with intent to deliver. He appeals, claiming the district court should have granted him a new trial because the prosecutor suppressed exculpatory evidence. He also claims the prosecutor engaged in misconduct by soliciting false testimony. We affirm.

ISSUES
[¶ 2] Mr. Lawson presents two issues for this Court's determination:
I. Did the trial court improperly deny the new trial motion for Brady violations?
II. Did the prosecutor engage in misconduct by eliciting false testimony?

FACTS
[¶ 3] In January of 2008, a Cheyenne resident informed the police department of suspected drug activity at a nearby house. Detective Russell Edwards began conducting surveillance of the residence and observed a high volume of traffic coming and going at all hours. Among those coming and going, Detective Edwards identified individuals known to law enforcement as drug users, some of whom had been involved in past drug investigations. Among those residing at the home, he identified Mr. Lawson; his girlfriend, Amanda Torres; her sister, Robyne Varela; and Angila Bolton.
[¶ 4] On February 21, 2008, Detective Edwards spoke to a confidential informant, later identified as Ashley Plavsik, who was in the detention center at the time on grand larceny charges. She informed Detective Edwards that Ms. Torres had been selling methamphetamine and cocaine from the residence. Ms. Plavsik said she had purchased cocaine from Ms. Torres on a daily basis between October and December of 2007. *997 She also indicated Ms. Torres kept controlled substances in a pink backpack.
[¶ 5] After speaking with Ms. Plavsik, Detective Edwards learned that Mr. Lawson and the others had been evicted from the residence. He subsequently learned they had moved to another Cheyenne neighborhood. In March of 2008, Detective Edwards met with a second confidential informant (CI2), whose identity was never disclosed, who said Ms. Torres was the leader of a drug trafficking organization and the others, including Mr. Lawson, sold drugs for her. CI2 claimed to have witnessed both Mr. Lawson and Ms. Bolton selling cocaine for Ms. Torres.
[¶ 6] During this time frame, two residents in the neighborhood contacted Detective Edwards to report suspected drug activity at the home occupied by Mr. Lawson and Ms. Torres. Detective Edwards began surveillance and on one occasion observed Mr. Lawson and Ms. Torres in the front yard. He saw Ms. Torres retrieve a pink backpack from a vehicle in the driveway and carry it into the residence.
[¶ 7] On March 31, 2008, Detective Edwards saw a man leave the residence in a vehicle with a Nebraska registration. Detective Edwards informed the patrol division and a few minutes later a patrol officer stopped the vehicle for a traffic violation. A canine unit arrived at the scene and the dog alerted to a container inside the vehicle. Inside the container, the patrol officer found 7 grams of methamphetamine and 1 gram of cocaine. The driver of the vehicle was identified as Steven Giatroudakis. He stated that he had gotten the drugs from Mr. Lawson and Ms. Torres approximately 15 minutes before the traffic stop. He also said Mr. Lawson and Ms. Torres had an additional 2 ounces of methamphetamine in their possession and had indicated they would be getting more early that morning.
[¶ 8] After speaking with Mr. Giatroudakis, law enforcement obtained a warrant to search the residence in the early morning hours of April 1, 2008. Upon entering one of the bedrooms, they found Ms. Torres in bed. Mr. Lawson appeared to have just gotten up and was standing next to the bed. Under Ms. Torres' pillow, they found a pink backpack containing over $2,000.00. Under the bed, they found zip-lock bags containing over 40 grams of cocaine and 7 grams of methamphetamine. Near the bed on an entertainment center, they found a digital scale, spoons and a white residue. They found more drug paraphernalia in other parts of the residence. Law enforcement arrested Mr. Lawson, Ms. Torres, Ms. Bolton and Ms. Varela.
[¶ 9] Based upon the drugs found under the bed in the April 1, 2008, search, Mr. Lawson was charged with one count of possession with intent to deliver cocaine in violation of Wyo. Stat. Ann. § 35-7-1031(a)(i) (LexisNexis 2009); one count of possession with intent to deliver methamphetamine in violation of the same statutory provision; one count of possession of cocaine in violation of § 35-7-1031(c)(ii); and one count of possession of methamphetamine also in violation of § 35-7-1031(c)(ii). Prior to his trial, Mr. Lawson filed a demand for disclosure of all exculpatory or impeachment evidence known to the State. Over the next four months, the State provided fifty-some pages of investigative reports to the defense.
[¶ 10] The matter went to trial in October of 2008. For its case, the prosecution relied on Ms. Plavsik and Mr. Giatroudakis to implicate Mr. Lawson in the drug activity. Ms. Plavsik testified that she purchased cocaine between October and December of 2007, generally from Ms. Torres but also from Mr. Lawson. She testified that on two or three occasions, she traded items she had stolen at Mr. Lawson's request for cocaine. She testified that one time Mr. Lawson asked her to steal a PlayStation 2 for him and gave her cocaine in exchange. Another time she stole video games for him in exchange for cocaine. Mr. Giatroudakis testified that he purchased methamphetamine from Mr. Lawson five or six times in the six months leading up to the traffic stop, search and his arrest. He testified that on the night of his arrest, he purchased 7 grams of methamphetamine from Mr. Lawson and Mr. Lawson gave him a gram of cocaine.
*998 [¶ 11] Mr. Lawson's sole defense was that he was not involved in the drug activity engaged in by his girlfriend, her sister and the others who shared the residence but lived in the house because he was in love with Ms. Torres. Ms. Torres testified that Mr. Lawson never used, sold or even touched controlled substances and did not approve of her use of drugs or involvement in selling them. Defense counsel called Ms. Plavsik to testify about a letter she wrote to Ms. Torres in April of 2008 stating that she and Ms. Bolton had obtained the cocaine found in the search from Mr. Giatroudakis and Ms. Bolton had hidden it under the bed. In the letter, Ms. Plavsik stated she was sorry that Ms. Torres and Mr. Lawson "got caught up in all of this mess." On cross-examination by the State, however, Ms. Plavsik testified that nothing she had written in the letter was true; Ms. Torres had asked her to write it and told her what to write. She testified Ms. Torres obtained a similar letter from Ms. Bolton in which Ms. Bolton took responsibility for the cocaine found in the search.
[¶ 12] Other than Ms. Plavsik's letter and Ms. Torres' testimony, Mr. Lawson's defense focused on discrediting Mr. Giatroudakis and Ms. Plavsik, the only witnesses directly implicating him in the drug activity. Through cross-examination, defense counsel attempted to show that Mr. Giatroudakis received favorable treatment in exchange for his testimony against Mr. Lawson. Specifically, defense counsel questioned Mr. Giatroudakis about his plea agreement in which the prosecutor agreed to recommend dismissal of one of the counts against him. Defense counsel also questioned Mr. Giatroudakis about the prosecution's agreement to the reduction of his bond from $15,000.00 to $100.00. Defense counsel also attempted to show that despite having admitted to law enforcement that she had stolen 300 to 400 items of property valued at $100,000.00 in exchange for drugs, Ms. Plavsik had not been charged with any crime for those thefts.
[¶ 13] The jury found Mr. Lawson guilty on all four counts. The district court concluded that counts I and III and counts II and IV merged and sentenced Mr. Lawson to two terms of two to four years in prison. Mr. Lawson filed a notice of appeal. He subsequently filed a motion in district court to supplement the record on appeal to include copies of the documents the State had produced in discovery prior to trial. The district court granted the motion.
[¶ 14] Mr. Lawson next filed a motion for new trial in district court in which he asserted that after his sentencing he had discovered a number of pieces of exculpatory and impeachment evidence the State had in its possession during or before the trial that it had not disclosed to him. Mr. Lawson also asserted the prosecutor solicited false testimony from Mr. Giatroudakis concerning the nature of promises the prosecutor made to him in exchange for his testimony. In a later pleading, Mr. Lawson identified the undisclosed exculpatory evidence as follows:
1. A report of police interviews of Ms. Varela and Ms. Torres on April 3 and 4, 2008, in which they stated the cocaine found under the bed during the search belonged to Ashley Plavsik and they had obtained the methamphetamine from someone named Chris Carney.
2. A September 1, 2008, report relating to Mr. Giatroudakis' August 2008 arrest for possession of methamphetamine, after entry of his plea to the charge arising out of his April 1, 2008, arrest.
3. A July 15, 2008, e-mail from the prosecutor to Ms. Bolton's defense counsel regarding the State's offer to recommend probation for her on the condition that she retract an earlier statement she had made indicating that she, and not Mr. Lawson, owned the drugs found at the residence.
4. A November 10, 2008, e-mail from the prosecutor to Mr. Giatroudakis' defense counsel acknowledging that Mr. Giatroudakis had received promises of probation in exchange for his testimony against Mr. Lawson and had "performed satisfactorily."
5. A page from the State's November 4, 2008, pretrial memorandum in State v. Torres stating that, if called, Chris Carney was expected to testify that he delivered approximately ¼ ounce of methamphetamine to Ms. Torres at the residence a short time before her arrest.

*999 6. A page from the State's November 4, 2008, notice of intent to introduce uncharged misconduct evidence in State v. Torres describing Mr. Carney's testimony concerning his delivery of methamphetamine to Ms. Torres the night before her arrest.
7. A plea agreement in State v. Giatroudakis, in which the State agreed to recommend a suspended sentence with supervised probation in exchange for Mr. Giatroudakis' guilty plea to one count of possession with intent to deliver methamphetamine and to dismiss a second charge in exchange for his testimony against Mr. Lawson.
8. A page from a presentence investigation report in State v. Giatroudakis also reflecting the State's agreement to dismiss a charge against Mr. Giatroudakis in exchange for his testimony against Mr. Lawson and others.
9. A plea agreement in State v. Bolton in which the State agreed to recommend first offender treatment in exchange for Ms. Bolton's guilty plea to felony possession of methamphetamine and her agreement to give a truthful factual basis for her plea.
10. The transcript of Ms. Bolton's re-arraignment in which she testified that on the night of March 31, 2008, she was in possession of over 3 grams of methamphetamine, it was her methamphetamine and she had used part of it before the search.
11. Part of an affidavit of probable cause in State v. Torres suggesting that Ms. Torres owned the cocaine and methamphetamine found under the bed and stating confidential sources had identified her as the seller of methamphetamine and cocaine.
12. Part of an affidavit of probable cause in State v. Bolton attributing ownership of the methamphetamine and cocaine found in the residence to Ms. Bolton and stating that confidential informants had identified Ms. Bolton as having sold methamphetamine and cocaine.
[¶ 15] At the hearing on his motion, Mr. Lawson also asserted the prosecution improperly withheld evidence that in an April 15, 2008, interview with the prosecution Ms. Bolton had admitted the methamphetamine seized at the residence on April 1, 2008, was hers and said Mr. Lawson did not use or sell drugs. Mr. Lawson asserted the prosecution intentionally omitted those details from a report initially provided in discovery and had disclosed the full report only after securing a letter from Ms. Bolton in which she retracted her earlier statement that the drugs were hers. Mr. Lawson also claimed the same day Ms. Bolton retracted her statement the prosecutor reduced the charges against her. The very next day, Ms. Bolton entered a guilty plea to the reduced charges and, when asked to provide a factual basis for her plea, admitted the drugs were hers in direct contradiction to her retraction. Mr. Lawson also asserted that the prosecutor had maintained during trial that Ms. Bolton had the right to assert her Fifth Amendment right not to testify without disclosing to the defense or the district court that Ms. Bolton had waived her Fifth Amendment right as part of her plea agreement. Mr. Lawson asserted, considered cumulatively, the undisclosed evidence supported his defense that the drugs belonged to others, provided further basis for impeachment of the State's witnesses and showed that some of the State's witnesses gave false testimony at trial.
[¶ 16] After a hearing, the district court denied Mr. Lawson's motion. While stating that it "would vastly have preferred that all of the evidence . . . have been made available to the defense in advance of trial," the district court determined that it could not conclude any material exculpatory evidence was suppressed. The district court entered an order to that effect on July 22, 2009.
[¶ 17] On August 7, 2009, Mr. Lawson filed a motion for rehearing in which he asserted that after the district court's denial of his earlier motion, the State had disclosed another report containing exculpatory evidence. The report was of an interview Detective Edwards conducted with an inmate in the Laramie County Detention Center in June of 2008, three months before Mr. Lawson's trial, who stated as follows:
[S]he was tired of all the lies and wanted to tell the truth about an investigation Detective Edwards had conducted on [her] *1000 boyfriend, Steven Giatroudakis. [She] advised Giatroudakis had purchased methamphetamine from Amanda Torres ... in the past and that [Mr.] Lawson was not involved.
[¶ 18] The district court convened a hearing on the motion. Mr. Lawson presented three witnesses: his trial counsel, the woman who made the above statement and Detective Edwards. After hearing their testimony and the arguments of counsel, the district court concluded the evidence was not material or exculpatory and denied the motion.

DISCUSSION

1. Suppression of Exculpatory Evidence
[¶ 19] Mr. Lawson asserts the prosecutor failed to disclose the documents identified in paragraphs 14 through 17 above and that those documents contained exculpatory evidence material to his defense. We generally review a district court's denial of a motion for a new trial for abuse of discretion. Hicks v. State, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo.2008). However, an improper suppression of exculpatory evidence violates a defendant's constitutional right to due process, and constitutional issues are usually subject to de novo review. Id. Accordingly, we will review de novo the district court's decision to deny Mr. Lawson's motion for a new trial on the grounds that the State improperly suppressed exculpatory evidence. Id.
[¶ 20] "The right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment, imposes on States certain duties consistent with their sovereign obligation to ensure `that justice shall be done' in all criminal prosecutions." Cone v. Bell, ___ U.S. ___, 129 S.Ct. 1769, 1772, 173 L.Ed.2d 701 (2009), citing United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The suppression by the prosecution of evidence favorable to a defendant and material to his guilt violates due process. Hicks, ¶ 31, 187 P.3d at 883, citing Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). This is true irrespective of whether the prosecution acted in good or bad faith in suppressing the evidence. Chauncey v. State, 2006 WY 18, ¶ 12, 127 P.3d 18, 21 (Wyo.2006), citing United States v. Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). The rule exists to "ensure that a miscarriage of justice does not occur." Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97.
[¶ 21] In order to establish a Brady violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. Id. Favorable evidence includes impeachment evidence. Bagley, 473 U.S. at 676, 105 S.Ct. at 3380; Davis v. State, 2002 WY 88, ¶ 18, 47 P.3d 981, 986 (Wyo.2002). Brady also extends to evidence gathered by investigating officers but not actually known to the prosecutor. Id., ¶ 14, 47 P.3d at 985. Brady imposes an affirmative duty on the prosecutor to learn of favorable evidence in the State's control and divulge such evidence to the defendant. Id. However, Brady does not "automatically require a new trial whenever a combing of the prosecutor's files after the trial discloses evidence possibly useful to the defense but not likely to have changed the verdict." Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). A finding that the undisclosed evidence is material is required. Id.
[¶ 22] Evidence is material under Brady only when a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383; Thomas v. State, 2006 WY 34, ¶ 15, 131 P.3d 348, 353 (Wyo.2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Id. When the defense makes a specific request and the prosecution fails to respond fully, the reviewing court may consider directly any adverse effect the failure to respond might have had on the preparation or presentation of the defendant's case. Bagley, 473 U.S. at 683, 105 S.Ct. at 3384. "The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing *1001 in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." Id. In judging materiality, the focus is on the cumulative effect of the withheld evidence, rather than on the impact of each piece of evidence in isolation. Id.; United States v. Nichols, 2000 WL 1846225, 2000 U.S.App. Lexis 33183, 2000 Colo. J. C.A.R. 6735 (10th Cir.2000).
[¶ 23] A review of cases in which courts have considered whether a Brady violation occurred illustrates the fact dependent nature of the inquiry. In Bagley, 473 U.S. at 669-70, 105 S.Ct. at 3377, the defendant had filed a discovery motion requesting "any deals, promises or inducements made to witnesses in exchange for their testimony." The Government did not disclose any deals, promises or inducements had been made to its principal witnesses, state law enforcement officers James O'Connor and Donald Mitchell, but did disclose affidavits signed by O'Connor and Mitchell describing their dealings with Bagley and concluding with the statement, "I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it." Id. Bagley was tried and convicted.
[¶ 24] Bagley subsequently received copies of contracts O'Connor and Mitchell had signed entitled "Contract for Purchase of Information and Payment of Lump Sum Therefor." The contracts stated the undersigned would provide information and "upon receipt of such information" and "upon the accomplishment of the objective sought to be obtained by the use of such information to [its] ... satisfaction ...," the United States would pay "a sum commensurate with services and information rendered." Id. at 671, 105 S.Ct. at 3378. According to a typewritten description added to each contract, O'Connor and Mitchell were to provide information concerning tobacco and firearms violations committed by Bagley and testify against him in court. On a line entitled "Sum to be Paid to Vendor," the figure $300.00 was handwritten. Id.
[¶ 25] Because the contracts were not disclosed to Bagley in pretrial discovery, he filed a motion to vacate his sentence alleging a Brady violation of his right to due process. The Court concluded:
[T]here is a significant likelihood that the prosecutor's response to respondent's discovery motion misleadingly induced defense counsel to believe that O'Connor and Mitchell could not be impeached on the basis of bias or interest arising from inducements offered by the Government. Defense counsel asked the prosecutor to disclose any inducements that had been made to witnesses, and the prosecutor failed to disclose that the possibility of a reward had been held out to O'Connor and Mitchell if the information they supplied led to "the accomplishment of the objective sought to be obtained ... to the satisfaction of [the Government]." This possibility of a reward gave O'Connor and Mitchell a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure conviction.
Id. at 684, 105 S.Ct. at 3384.
[¶ 26] More recently, in Cone, 129 S.Ct. 1769, the Court considered a claimed Brady violation in the context of evidence the State had withheld tending to support the defendant's insanity defense. Charged with two counts of first-degree murder, Cone's sole defense at trial was that he was not guilty by reason of insanity resulting from acute amphetamine psychosis. Id. at 1772-73. His defense was supported by the testimony of three witnesses: his mother, who testified that after his service in Vietnam her son had changed, slept restlessly and sometimes yelled out in his sleep and began using drugs; a clinical psychologist, who testified that Cone's substance abuse and posttraumatic stress disorder from Vietnam rendered him substantially incapable of conforming his conduct to the law; and a neuropharmacologist, who testified that Cone's history of illicit drug use beginning in the Army had led to *1002 chronic amphetamine psychosis, a disorder manifested through hallucinations and paranoia that prevented him from obeying the law and appreciating the wrongfulness of his actions. Id. at 1173-74. The State's strategy was "to present Mr. Cone as a calculating, intelligent criminal who was fully in control of his decision and actions at the time of the crimes. A key component of that strategy involved discrediting Cone's claims of drug use." Id. at 1174. To that end, the State presented expert and lay witnesses to establish that he was not addicted to drugs, including a former heroin addict with whom he had spent time a few months before the murders who testified that she no longer used drugs, stayed away from people who did, had never seen Cone use drugs and had never seen him show signs of paranoia. The jury convicted Cone on all counts.
[¶ 27] Subsequently, Cone learned about evidence the State possessed but had not disclosed, including statements by witnesses that he appeared "drunk or high," "acted real weird," and "looked wild eyed" in the two days before the murders, statements of police officials that he was a serious drug user, and undisclosed notes of a police interview with the former heroin addict showing discrepancies between her initial statement and her trial testimony. Id. at 1783-84. While taking exception to the appellate court's failure to assess the effect of the suppressed evidence collectively, rather than item by item, the Supreme Court concluded that even when assessed collectively, the suppressed evidence was not sufficient to undermine confidence in the verdict. The Court stated:
Cone's experts testified that his drug addiction and posttraumatic stress disorder originated during his service in Vietnam, more than 13 years before the [murders]. During those years, despite Cone's drug use and mental disorder, he managed to successfully complete his education, travel, and (when not incarcerated) function in civil society. The suppressed evidence may have strengthened the inference that Cone was on drugs or suffering from withdrawal at the time of the murders, but his behavior before, during and after the crimes was inconsistent with the contention that he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. The likelihood that the suppressed evidence would have affected the jury's verdict on the issue of insanity is remote.
Id. at 1785. The Court held the appellate court did not err by denying habeas relief on the ground that the suppressed evidence was immaterial to the jury's finding of guilt.[1]
[¶ 28] In a double homicide case, the Tenth Circuit Court of Appeals applied Brady to conclude its confidence in the outcome of the trial had been seriously undermined by the cumulative effect of evidence the prosecution had not disclosed. Smith v. Secretary of New Mexico Dep't of Corrections, 50 F.3d 801, 828 (10th Cir.1995). Smith was convicted of first degree murder in the deaths of two women. At the time he was being investigated in connection with the deaths, law enforcement officials were also investigating another suspect, Randy Newell, the boyfriend or common law husband of one of the victims. Id. at 810. The prosecution did not disclose to Smith the investigative reports relating to Mr. Newell. After a jury found Smith guilty of murder, he sought post-conviction relief claiming the prosecution violated Brady when it failed to disclose evidence relating to his defense that someone else committed the murders. The specific evidence in question included women's clothing with what appeared to be blood stains taken from Mr. Newell's car a few days after the bodies were found; police reports indicating Mr. Newell's status as a suspect in the other investigation; Mr. Newell's presence on two separate occasions near the location where the bodies were found; Mr. Newell's use of "Randy" Newell as an alias for his *1003 true name, Samuel J. Newell; the prior conviction record of Samuel J. Newell and his status as a fugitive with an outstanding arrest warrant; and several statements Mr. Newell made to law enforcement personnel. Concluding that the undisclosed evidence "would have provided important investigative leads and impeachment evidence to the defense," "was highly probative with respect to Mr. Smith's defense at trial and could very well have resulted in an acquittal," and, considered cumulatively, undermined confidence in the outcome of the trial, the Court held Smith was denied his right to a fair trial. Id. at 829, 833, 834, 835.
[¶ 29] In contrast to the result reached in Smith, the Tenth Circuit held in United States v. Nichols, 2000 WL 1846225, 2000 U.S.App. LEXIS 33183, 2000 Colo. J. C.A.R. 6735, that no Brady violation occurred when the prosecution failed to disclose sixty-two FBI documents prior to Nichols' trial for conspiring to bomb the Oklahoma City federal building. Some of the documents concerned contacts co-defendant Timothy McVeigh had with known militia groups; others concerned Michael Fortier, who pleaded guilty to crimes related to the bombing; still others concerned a possible additional conspirator. Id. After reviewing the documents, the Court found that none of them cast doubt on Mr. Nichols' participation in the bombing; therefore, "[w]hen considered with the whole of the evidence, [they] bear insufficient probative value to suggest, if disclosed, they reasonably would have changed the outcome." Id.
[¶ 30] This Court, like the United State Supreme Court and the Tenth Circuit Court of Appeals, has addressed claims of Brady violations with varying results depending on the evidence at issue. In Davis, ¶ 1, 47 P.3d at 982, the defendant was convicted of delivery of and conspiracy to deliver methamphetamine. At trial, the prosecution introduced a tape recording made by Morris, a confidential informant, of the transaction in which Davis allegedly participated in purchasing methamphetamine. Id., ¶ 7, 47 P.3d at 983. Because Davis's voice could not be heard clearly on the recording, the crux of the State's case was the informant's testimony that the recorder malfunctioned and, although Davis's voice could not be heard, he had in fact participated in the delivery. Id. Thus, Morris's credibility was central to the State's case. In addition to her testimony implicating Davis in the drug deal, the State solicited testimony from Morris that she was a recovering drug addict and wanted to change her life and escape from the drug world. Id., ¶ 9, 47 P.3d at 984.
[¶ 31] After Davis's conviction and sentencing, another informant notified defense counsel that approximately a month before Davis's trial, she had recorded a conversation with Morris in the course of an unrelated investigation. On the recording, Morris could be heard consuming methamphetamine and making statements indicating she was not a reformed drug addict trying to escape the drug world. Id., ¶ 11, 47 P.3d at 984. At a hearing on Davis's motion for a new trial, the defense presented the tape recording of Morris and the informant testified that Morris had told her the recorder used in the earlier transaction had not malfunctioned; rather, she had deliberately turned it off. Id., ¶ 12, 47 P.3d at 985.
[¶ 32] On appeal from the district court's determination that no Brady violation occurred, this Court reversed, finding that the prosecution suppressed the tape of Morris, the tape was the only evidence the defense had to impeach the State's principal witness, and because no evidence other than Morris's testimony implicated Davis in the drug transaction, the undisclosed impeachment evidence was material. Id., ¶ 14, 47 P.3d at 986.
[¶ 33] More recently, we addressed a Brady claim in a case somewhat similar to Mr. Lawson's case. In Chauncey, the State presented the testimony at trial of CS that she had purchased methamphetamine from Chauncey and his girlfriend at the home where they lived together. CS testified that her initial conversations about methamphetamine were with the girlfriend, but that she spoke with Chauncey on the telephone about whether to come to the house to pick up the drugs and when she arrived at the house, he met her at the door and took her into a bedroom where the girlfriend told him to give her the methamphetamine. Id., ¶ 6, 127 *1004 P.3d at 20. CS testified that she and Chauncey agreed on what looked like about a quarter-gram and she left the residence and was arrested a short time later after using part of the methamphetamine. Id. The defense relied on the girlfriend's testimony that she sold the methamphetamine to CS and Chauncey was not involved in the transaction. Id., ¶ 10, 127 P.3d at 21.
[¶ 34] The jury found Chauncey guilty of one count of delivery of, and one count of conspiracy to deliver, a controlled substance to a person under eighteen years of age. Id., ¶ 11, 127 P.3d at 19. After the trial, Mr. Chauncey obtained two documents not disclosed previously: a summary of a DCI interview of CS in which she identified twenty-seven people to whom she or another woman, Leanne Richardson, had sold methamphetamine and a summary of a DCI interview of Richardson in which she stated she knew Chauncey, sometimes babysat his and the girlfriend's child, and never saw him sell any drugs. Id., ¶ 15, 127 P.3d at 22.
[¶ 35] On appeal to this Court from the district court's denial of his motion for new trial, we concluded that because the CS interview reflected the names of people she provided drugs to and not her sources for obtaining drugs it did not tend to prove that Chauncey was not involved in delivering controlled substances. Id. Responding to the argument that Davis controlled, we said:
This case presents a much different situation than Davis. Whereas in Davis, Morris could not effectively be impeached without the suppressed information, in the instant case, CS's credibility was extensively challenged. * * * Specifically, the jury had been told that CS was a "worldly young lady" who received special deals from methamphetamine dealers because she was able to set the dealers up with other buyers. On direct and cross-examination, CS's past use of methamphetamine, marijuana, and cocaine was explored, as were her previous drug-related arrests and convictions and her difficulty abstaining from narcotics. CS was also questioned about her mental state on the night in question, to which she replied that she had used methamphetamine earlier on October 27 and that night she was "[n]ot really high, but more just coming down." The appellant was also given extensive discovery materials that included statements by CS and another individual tending to show she was heavily involved in using and selling narcotics. Finally, the appellant had CS's testimony from [his girlfriend]'s trial which detailed CS's drug use and which was also used at the appellant's trial to impeach CS.
Id., ¶ 20, 127 P.3d at 23. We concluded:
Where, as in the instant case, a witness for the State has been exhaustively impeached, both generally and as to the specific issue addressed by the suppressed evidence, we do not believe that one additional piece of cumulative information makes the verdict unworthy of confidence.
Id., ¶ 21, 127 P.3d at 24. With these fact specific applications of Brady in mind, we turn to consideration of Mr. Lawson's claim.
[¶ 36] Mr. Lawson has identified thirteen documents that the State did not disclose to him. The documents vary in kind but fall mostly into two categories: documents providing support for Mr. Lawson's claim that he was not involved in drug activity and documents providing information he could have used to impeach the State's witnesses. The documents falling into the first category include the interview statements of Ms. Varela and Ms. Torres that they had obtained the methamphetamine found under the bed from Mr. Carney, and Ms. Plavsik had left the cocaine at the residence. Also included are pages from the court file in State v. Torres indicating that Mr. Carney delivered methamphetamine to Ms. Torres the night before her arrest, she owned the drugs found under the bed and confidential sources had identified her as selling methamphetamine and cocaine. Similarly, a page from the court file in State v. Bolton attributed ownership of the drugs to Ms. Bolton and stated that confidential informants had identified her as selling methamphetamine and cocaine. Another document falling into the first category is the statement of the detention center inmate and girlfriend of Mr. Giatroudakis that she was tired of all the lies and wanted to tell the truth, Mr. Giatroudakis had purchased methamphetamine *1005 from Ms. Torres in the past and Mr. Lawson was not involved with illegal drugs.
[¶ 37] Mr. Lawson also makes much of reports Detective Edwards prepared of an April 15, 2008, interview of Ms. Bolton. In its initial discovery responses, the prosecution produced a partial report of the interview, dated April 23, 2008, which stated only that Detective Edwards and the prosecution met with Ms. Bolton and her attorney and Ms. Bolton made statements concerning four children who lived in the Lawson/Torres residence, two of whom were Ms. Torres' children, and slept in the room where the drugs were found. Nearly three months later, and six weeks before trial, the prosecution disclosed another report dated August 6, 2008, reflecting that Ms. Bolton also had stated during the April 15, 2008, interview that she had started using methamphetamine when she was thirteen years old, she began selling it in January of 2008, her primary source for the drug was Mr. Giatroudakis and she had sold methamphetamine to Ms. Plavsik approximately twenty times. The later report also indicated Ms. Bolton had said during the interview that the drugs found under Ms. Torres' and Mr. Lawson's bed on April 1, 2008, were hers, she and Ms. Plavsik had stolen them from Mr. Giatroudakis the night before and she hid them under the bed so no one would steal them. Additionally, the report indicated Ms. Bolton stated during the interview that Mr. Lawson did not use or sell drugs.
[¶ 38] The State offers no explanation for the two reports but asserts that, rather than being inconsistent with Detective Edwards' earlier report, the second report merely sets forth in more detail Ms. Bolton's statements during the interview. Although the reports raise serious questions about the State's actions, the issue presented for this Court's determination is whether the prosecution's failure to disclose the full report of the Bolton interview until six weeks before trial constitutes a Brady violation. As we have said,
[t]he essence of Brady is the discovery of information after the trial, which was known to the prosecution but unknown to the defense during the trial. . . . Thus, where exculpatory evidence is discovered during the trial and defense counsel has the opportunity to use it in cross-examination, closing argument, or other parts of the defense case, courts generally do not find a due process violation.
Thomas, ¶ 16, 131 P.3d at 353. Given that the defense had the full report of the Bolton interview six weeks before trial, we conclude there was no Brady violation with respect to the Bolton interview documents.
[¶ 39] The second category of undisclosed documents includes pages from the State v. Giatroudakis court file and e-mails between Mr. Giatroudakis' defense counsel and the prosecutor. In an undisclosed e-mail to Mr. Giatroudakis' counsel, the prosecutor stated:
On Docket 29-889, the agreement was for probation due to his helping the police and for agreeing to testify against others. He held-up his end of that deal by testifying against Aubrey Lawson. I think [Mr. Giatroudakis'] cooperation was very helpful and he's done a good job. I think that finishes that docket for now.
Additionally, the undisclosed documents include a presentence investigation report (PSI) stating that a plea agreement was filed in August of 2008, two months before Mr. Lawson's trial, in which Mr. Giatroudakis agreed to plead guilty to possessing methamphetamine with intent to deliver and provide testimony against Mr. Lawson in exchange for the State's agreement to dismiss one charge and recommend a suspended sentence with four years supervised probation on the second charge. The undisclosed documents also include the actual plea agreement in which the prosecutor agreed to recommend the disposition described in the PSI. The documents also include Detective Edwards' report of Mr. Giatroudakis' arrest in August of 2008 while he was out on bond on the April charges.
[¶ 40] In addition to its failure to disclose the documents concerning Mr. Giatroudakis' plea agreement, Mr. Lawson contends his due process right was violated when the prosecutor solicited false testimony from Mr. *1006 Giatroudakis that there was no plea agreement. At trial, during the prosecutor's redirect examination of Mr. Giatroudakis, the following exchange occurred:
Q. [By the prosecutor] . . . [Defense counsel] was inquiring about your recent drug conviction . . . you were convicted of what?
A. I was convicted of selling and delivering methamphetamine.
Q. How many times?
A. One.
. . . .
[Prosecutor]: May I have just a moment, Your Honor?
The Court: You may.
Q. (By [the prosecutor]) Mr. Giatroudakis, [defense counsel]and I have to admit I maybe didn't follow it exactlybut I believe he was inquiring about some type of arrangement with the State with your charges. I mean, is there a deal somehow?
A. Not that I know of, no.
[¶ 41] In addition to this testimony and the undisclosed documents pertaining to Mr. Giatroudakis' plea agreement, the prosecution did not disclose e-mails and court documents concerning the disposition of the charges filed against Ms. Bolton as a result of the April 1, 2008, search. In mid-July of 2008, Ms. Bolton's attorney and the prosecutor exchanged e-mails concerning a potential plea agreement on the charges against Ms. Bolton. The prosecutor's e-mail reflects that Ms. Bolton's "complete, truthful cooperation (including testifying) about her knowledge [of] and involvement in drug trafficking and associated crimes would mean the difference between a recommended imposed sentence and a recommendation for probation for her." The e-mail further reflects that the prosecutor "would also expect [Ms. Bolton] to explain that she was not honest" when she stated in the April 15 interview that the drugs found in the April 1 search were hers. On August 22, 2008, in accordance with the prosecutor's expectation, Ms. Bolton provided a written statement in which she said her earlier statements that the drugs found under the bed were hers and she had stolen them from Mr. Giatroudakis were not true.
[¶ 42] On September 3, 2008, the prosecution and Ms. Bolton entered into a plea agreement in which the State agreed to recommend first offender treatment, including two years probation, in exchange for Ms. Bolton's guilty plea to felony possession of methamphetamine and her agreement to give a truthful factual basis for her plea. Contrary to the earlier e-mail, however, the plea agreement did not condition the recommendation for first offender treatment on Ms. Bolton's agreement to testify. On the same day she signed the plea agreement Ms. Bolton appeared in district court for re-arraignment and entered a plea of guilty to the charge of felony possession of methamphetamine. As the factual basis for her plea, Ms. Bolton testified that on the night she was arrested following the search she was in possession of over 3 grams of methamphetamine and the methamphetamine seized in the search of the residence was hers. The prosecution did not disclose the plea agreement or a transcript of the re-arraignment proceedings prior to Mr. Lawson's trial.
[¶ 43] Had Ms. Bolton testified at Mr. Lawson's trial, the circumstances surrounding her inconsistent statements, plea agreement and change of plea might have been helpful to his defense. However, Ms. Bolton invoked her Fifth Amendment right not to incriminate herself and did not testify. Mr. Lawson complains that at the same time the prosecution was supporting Ms. Bolton's right to invoke the Fifth Amendment the prosecution knew, and did not disclose to the defense or the district court, that she had given up that right as part of her plea agreement. The plea agreement, however, does not reflect any agreement by Ms. Bolton to testify. It states only that she agreed to give a factual basis for her plea. While her agreement to testify may have been discussed during the plea negotiations, it does not appear that it was part of the actual plea agreement. In any event, Ms. Bolton exercised her right not to testify and the district court ruled that she could not be required to testify. The district court further ruled that Ms. Bolton's statements during the April 15 *1007 interview were not admissible because there was no corroborating evidence of their trustworthiness. Because Mr. Lawson does not challenge the district court's rulings on those issues, we do not address them.
[¶ 44] Having described the undisclosed documents, we consider them cumulatively to determine whether the prosecution's failure to disclose them undermines our confidence in the outcome of the trial. The undisputed evidence showed Mr. Lawson lived in a house where significant drug activity was ongoing, all of the other residents, including Mr. Lawson's girlfriend, were intimately involved with drugs, and drugs and drug paraphernalia were found in the room and under the bed where Mr. Lawson slept. Photographs the State introduced into evidence clearly showed a digital scale, two spoons and a white substance on a red entertainment center located in the bedroom occupied by Mr. Lawson. Other photographs showed Ziploc bags found between the mattress where Mr. Lawson slept and a chest at the end of the bed. The State presented evidence through Ms. Plavsik that Mr. Lawson had direct involvement in drug trafficking. Although her knowledge of his involvement was limited to the October through December 2007 time frame, and she did not implicate him directly in possessing the drugs found under the bed in April of 2008, Ms. Plavsik's testimony provided support for the State's case that Mr. Lawson was involved in drug activity. Mr. Giatroudakis' statements to law enforcement prior to the search of the residence that he obtained the drugs from Mr. Lawson and Ms. Torres further supported the case against Mr. Lawson.
[¶ 45] The undisclosed statements of Ms. Torres and Ms. Varela that the drugs were theirs and of Mr. Giatroudakis' incarcerated girlfriend that Mr. Lawson was not involved with drugs were cumulative of evidence that was disclosed, i.e., Ms. Bolton's interview statement that Mr. Lawson did not use or sell drugs, and also of evidence the defense presented at trial, i.e., Ms. Torres' testimony that Mr. Lawson was not involved. While the undisclosed evidence may have strengthened Mr. Lawson's defense that he was not involved in the drug activity, the likelihood that it would have changed the jury's verdict is remote. The photographs the State introduced into evidence and Ms. Plavsik's testimony were strong evidence of Mr. Lawson's involvement. This was not a situation like Smith in which evidence implicating another suspect necessarily exculpated Mr. Lawson. The situation more closely resembled Nichols and Chauncey, in which the courts concluded evidence of the involvement of others did little to cast doubt on the particular defendant's involvement. While some of the documents supported the inference that Ms. Torres or Ms. Bolton may have been the principal participants in the drug activity and the primary focus of the investigation, they are similar to the undisclosed evidence in Chauncey in that they do not tend to prove that Mr. Lawson was not involved in drug activity. Given the circumstantial evidence that he lived in a home where drug activity was common place, and slept in a bedroom where drugs and drug paraphernalia were found hidden and in open view, the prosecution's failure to disclose evidence supporting Mr. Lawson's defense does not undermine our confidence in the verdict.
[¶ 46] Turning to the impeachment evidence, there is no question the undisclosed evidence would have been useful to Mr. Lawson in his efforts to impeach Mr. Giatroudakis and Ms. Bolton if she had testified. However, the undisclosed evidence concerning Mr. Giatroudakis' plea agreement did not induce the defense to believe he could not be impeached as happened in Bagley. Instead, as in Chauncey, the defense challenged Mr. Giatroudakis' credibility. The jury heard testimony about his history of using and selling drugs. He testified that he was addicted to drugs. He testified he had sold methamphetamine to different people probably forty to fifty times beginning in December of 2007. He testified about his 1999 felony conviction for taking indecent liberties with a minor. He testified that his most recent arrest was for possession of, and possession with intent to deliver, methamphetamine. He testified that when the police stopped him on April 1, 2008, he lied and tried to run away.
*1008 [¶ 47] The record is clear that during redirect examination, the prosecutor solicited testimony from Mr. Giatroudakis that he did not know of any deal with the State with regard to the charges filed against him. However, the jury also heard him testify on cross-examination that he had a plea agreement with the State to plead guilty to the delivery count in exchange for the prosecutor's agreement to dismiss the possession count and recommend probation. Mr. Giatroudakis also testified that his original bond of $15,000.00 was reduced and he only had to pay $100.00 to get out of jail. Thus, the jury heard evidence from which it could infer that the only witness directly implicating Mr. Lawson in the April 2008 drug activity had received favorable treatment from the State for his admitted criminal conduct. Yet, the jury remained persuaded that Mr. Lawson was involved in drug trafficking. Given that the jury heard evidence from which it might have concluded Mr. Giatroudakis was testifying falsely for his own benefit, we simply are not persuaded, as the Tenth Circuit was in Smith, that the undisclosed evidence "would have provided important investigative leads and impeachment evidence to [the defense]," "was highly probative with respect to Mr. [Lawson]'s defense at trial and could very well have resulted in an acquittal." Smith, 50 F.3d at 829, 833.

2. Prosecutorial Misconduct
[¶ 48] In his second issue, Mr. Lawson contends the prosecutor committed misconduct when she solicited false testimony from Mr. Giatroudakis that there was no deal. Defense counsel did not object at trial to the prosecutor's question or the witness's response. In the absence of an objection, we review the claim for plain error. Conine v. State, 2008 WY 146, ¶ 11, 197 P.3d 156, 160 (Wyo.2008). In order to establish plain error, Mr. Lawson must show: 1) the alleged error clearly appears in the record; 2) the error transgressed an unequivocal rule of law in a clear and obvious way; and 3) the error adversely affected Mr. Lawson's substantial right resulting in material prejudice to him.
[¶ 49] The first prong of the plain error test is satisfied. The error Mr. Lawson alleges clearly appears in the record. The trial transcript reflects that the prosecutor solicited testimony from Mr. Giatroudakis that there was "no deal" concerning the charges against him when in fact a plea agreement existed in which the State dismissed one charge and recommended probation on the second charge in exchange for Mr. Giatroudakis' guilty plea and testimony against Mr. Lawson.
[¶ 50] Turning to the second prong, the United States Supreme Court has said: deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. Giglio, 405 U.S. at 153-54, 92 S.Ct. at 766, citing Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Id., citing Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In light of the evidence the defense uncovered after the trial of a plea agreement in which Mr. Giatroudakis agreed to plead guilty to the delivery charge, the State agreed to recommend probation, Mr. Giatroudakis agreed to provided testimony in Mr. Lawson's case and the State agreed to dismiss the possession charge, Mr. Giatroudakis' testimony that there was no deal that he knew of was false. The prosecutor not only solicited the false testimony but allowed it to go uncorrected. Mr. Lawson has shown that the error transgressed an unequivocal rule of law in a clear and obvious way.
[¶ 51] Under the third prong of the plain error test, a new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . ." Id. Applying these principles in Giglio, where Taliento, the prosecution's principal witness, testified falsely that there was no agreement of leniency in exchange for his testimony, the Court stated:
Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in *1009 the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it. For these reasons, the due process requirements enunciated in Napue and the other cases cited earlier require a new trial....
Id. at 154-55, 92 S.Ct. 763.
[¶ 52] In contrast to the situation in Giglio, the jury was aware through defense counsel's cross examination of Mr. Giatroudakis that he had a plea agreement with the State. Additionally, in contrast to Giglio, the State's case against Mr. Lawson did not depend entirely on Mr. Giatroudakis' testimony. In addition to the circumstantial evidence that Mr. Lawson was involved in drug activity, Ms. Plavsik testified that Mr. Lawson asked her to steal items for him in exchange for drugs. Thus, even without Mr. Giatroudakis, the State had evidence to support the charges against Mr. Lawson and take the case to the jury. While Mr. Giatroudakis' credibility as a witness was an important issue, and the prosecutor knowingly committed misconduct in soliciting and failing to correct the false testimony concerning his plea agreement, Mr. Lawson has not shown that it materially prejudiced him.[2]
[¶ 53] In concluding that Mr. Lawson has not shown that he is entitled to a new trial for due process violations under Brady or Giglio, we do not condone the prosecution's failure to disclose the documents at issue or its solicitation of false testimony. It appears clear from this record that document disclosure did not occur as required and false testimony was solicited in contravention of our rules of ethics. While transgressions of this sort should not occur in the courts of this State, the aim of due process "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." Brady, 373 U.S. at 87, 83 S.Ct. at 1197. Moreover,
[T]he constitutional obligation [to disclose unrequested information] is [not] measured by the moral culpability, or willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. Conversely, if evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.
Agurs, 427 U.S. at 110, 96 S.Ct. at 2401 (footnote and citation omitted). The task at hand is not punishment of the prosecutor, but to determine whether Mr. Lawson was materially prejudiced. Given Mr. Giatroudakis' testimony that he had a plea agreement and the evidence implicating Mr. Lawson in the drug activity, we conclude Mr. Lawson has not shown material prejudice. In reaching this result, however, we remind prosecutors that when they solicit false testimony or fail to disclose exculpatory evidence they not only fail in their duty and risk otherwise justifiable convictions, but expose themselves to the charge that they have violated Rule of Professional Conduct 3.8.
[¶ 54] Affirmed.
GOLDEN, Justice, specially concurring.
[¶ 55] This opinion encompasses three consolidated appeals before this Court. I believe that each appeal should be affirmed. I write separately because the majority opinion *1010 fails to distinguish between the three appeals. This failure results in an improper analysis.
[¶ 56] The three appeals must be treated separately, with a focus on the issues appropriate to each appeal.[3] I note that this is difficult because Lawson's appellate brief does not treat the appeals separately. He fails to set forth specific issues for each appeal. He then provides only one analysis without identifying to which appeal it applies. Because the majority opinion has accepted Lawson's brief for consideration, I will also do so. It is not my intent to engage in what I believe is the appropriate analysis on the merits. My purpose is simply to lay out what I consider to be the proper approach to deciding these appeals.
[¶ 57] As stated, each appeal must be addressed separately. Appeal No. S-09-0061 is an appeal from the Judgment and Sentence of the district court filed on February 6, 2009. After reviewing Lawson's brief, I find no argument presented that applies to the trial or other proceedings underlying that Judgment and Sentence. I would therefore summarily affirm Appeal No. S-09-0061.
[¶ 58] Appeal No. S-09-0209 arises from Lawson's Motion for New Trial that was filed on June 15, 2009. As stated in the majority opinion, generally Lawson complained of certain exculpatory and impeachment evidence the State did not disclose before or during trial, as well as allegedly false testimony solicited by the prosecutor during trial. In his appellate brief, Lawson presents argument that numerous Brady violations occurred (as further explained in the majority opinion). Lawson also presents argument regarding the alleged prosecutorial misconduct in soliciting false testimony. A review of Lawson's appellate brief, therefore, reveals that his argument is directly related to the district court's denial of this motion for a new trial.[4] As such, this Court is required to engage in an analysis of the proceedings underlying that denial. The proceedings included a full evidentiary hearing on Lawson's motion, after which the district court found that no Brady violation had occurred and also that the prosecutor had not solicited false testimony. The review by this Court should be of the district court's findings using the appropriate standards of review.[5]
[¶ 59] Turning to Appeal No. S-10-0001, this appeal is from an order denying a second new trial motion that was entered on September 30, 2009. Lawson based his underlying motion on an alleged new Brady violation by the State. The district court held a full evidentiary hearing, after which it held that the newly discovered evidence brought to its attention did not meet the materiality or exculpatory requirements of Brady. Lawson's appellate brief addresses the newly discovered evidence that was at issue at this hearing. Therefore, there is at least one issue to be analyzed within the context of this appeal.
[¶ 60] If each appeal were analyzed independently as I believe should be done, the analysis would be considerably different. Most importantly, different standards of review would be applied. However, in the end, I am convinced by my own review that the ultimate result reached in the majority opinion is correct.
NOTES
[*] Chief Justice at time of oral argument.
[1] Addressing the question of whether the suppressed evidence was material in the sentencing phase of Cone's case, a question not at issue in Mr. Lawson's case, the Court concluded neither the district court nor the appellate court fully considered the issue. Because the suppressed evidence "may well have been material to the jury's assessment of the proper punishment," i.e. life in prison versus a death sentence, the Court remanded to the district court for a full review of the suppressed evidence and its effect on the sentence. Id. at 1786.
[2] Mr. Lawson presented his claim of prosecutorial misconduct to the district court in his motion for new trial, which motion the district court denied. In claiming on appeal that the prosecutor committed misconduct by soliciting and failing to correct false testimony, Mr. Lawson makes no argument that the district court abused its discretion in denying his motion for new trial. To the extent his argument on appeal incorporates by implication an abuse of discretion claim, we conclude the district court did not abuse its discretion in denying the motion for new trial based upon prosecutorial misconduct. That is, from the evidence before it, including Mr. Giatroudakis' testimony on cross-examination that he had a plea agreement with the State, the district court reasonably could have concluded there was not a reasonable likelihood that his later false testimony could have affected the jury's judgment.
[3] Consolidation of the appeals in this instance was done for the purpose of judicial economy. Consolidation does not change the independent nature of each appeal. See generally 5 C.J.S. Appeal and Error § 784 (2007).
[4] The majority opinion analyzes the prosecutorial misconduct allegation as a trial error. It applies a plain error standard of review to this claim because the testimony allegedly elicited by the prosecutor was not objected to at trial. Logically, Lawson could not have objected to the testimony at trial since he did not know it was false until he received the belated disclosure of the plea agreement materials from the State. Thus, the issue lies firmly within Appeal No. S-09-0209 and not Appeal No. S-09-0061.
[5] In general, the standard of review on a motion for new trial is an abuse of discretion. However, as the majority opinion points out, an alleged Brady violation is reviewed de novo. Davis v. State, 2002 WY 88, ¶ 16, 47 P.3d 981, 985-86 (Wyo.2002); Lacey v. State, 803 P.2d 1364, 1368-69 (Wyo. 1990).